[No. 1860]

MAMIE A. FORRESTER, AS THE ADMINISTRATRIX OF THE ESTATE OF DICK FORRESTER, DECEASED, RESPONDENT, *v.* SOUTHERN PACIFIC COMPANY (A CORPORATION), APPELLANT.

1. APPEAL AND ERROR—REVIEW—VERDICT—CONFLICTING EVIDENCE.

On appeal from a verdict for the plaintiff, in an action where the testimony was conflicting, facts may be regarded as shown by the evidence for the plaintiff.

2. EXECUTORS AND ADMINISTRATORS — APPOINTMENT — COLLATERAL ATTACK.

The appointment of an administratrix cannot be attacked collaterally, in an action instituted by a decedent before his death and continued by the administratrix, where the court appointing her had jurisdiction to make the appointment.

3. EXECUTORS AND ADMINISTRATORS — APPOINTMENT — JURISDICTION OF COURT—EXISTENCE OF ASSETS.

Where the plaintiff, in an action to recover damages for the wrongful expulsion from a train, who was a nonresident and had no other property in the state, died while the action was pending, his right of action was property upon which letters of administration might issue in the county in which the case was pending, even though the action might also have been instituted in the state of his residence.

4. ABATEMENT AND REVIVAL — DEATH OF PARTY — SURVIVAL OF ACTION—ACTION ON CONTRACT—TRANSITORY ACTION.

Under Comp. Laws, 2951, providing that actions founded upon contracts may be maintained by executors and administrators in all cases where they might be maintained by the decedent in his lifetime, an action for damages caused by wrongful ejection of a passenger from a train, where the passenger had paid his fare and received a ticket, is a transitory action upon a contract which may be continued by the administratrix of the plaintiff after his death.

Points decided

5. COURTS—UNITED STATES COURTS—AUTHORITY OF STATE DECISION
   —CONSTRUCTION OF STATE STATUTE.

   The federal courts follow the decisions of the highest courts
   of the states in construing the constitution and laws of the
   state, unless they conflict with the United States constitution
   or laws.

6. ABATEMENT AND REVIVAL—STATUTES—CONSTRUCTION—REFERENCE
   TO COMMON LAW.

   It is not the duty of the court, in construing a statute
   providing for the survival of actions, though in derogation
   of common law, to hold that the legislature did not intend
   what the language of the act clearly indicates, or that cases
   which would not survive at common law should be excluded
   from the operation of the statute, where they come within the
   ordinary meaning of the words employed.

7. ACTIONS — NATURE — TORT — EXPULSION OF TRESPASSER FROM
   TRAIN.

   An action for damages for injuries due to the use of
   excessive force in ejecting a trespasser from a train is an
   action in tort, and not upon breach of contract.

8. ABATEMENT AND REVIVAL — DEATH OF PARTY — REVIVAL OF
   ACTIONS—STATUTORY PROVISIONS.

   The legislature has the power to provide that actions for
   the tortious breach of contract shall survive the death of the
   plaintiff.

9. DAMAGES—EXEMPLARY DAMAGES—BREACH OF CONTRACT.

   Exemplary damages are allowable in proper cases, and may
   be recovered in an action for the tortious breach of a contract
   as well as for a tort unconnected with any contract.

10. CARRIERS — CARRIAGE OF PASSENGERS — ACTION FOR WRONGFUL
    EJECTMENT—EVIDENCE—RATIFICATION OF TORT.

    In an action for wrongful ejectment of a passenger by a
    train agent, who had special authority to take up tickets and
    remove passengers, evidence *held* sufficient to show that the
    company had ratified the acts of the agent in ejecting the
    passenger, if such ratification was necessary to render it
    liable for exemplary damages.

11. PRINCIPAL AND AGENT — MASTER AND SERVANT — EXEMPLARY
    DAMAGES—LIABILITY FOR ACTS OF EMPLOYEE.

    A principal or master is liable for exemplary damages for
    the wrongful, wanton, and oppressive acts of his agents or
    servants when acting within the scope of his employment,
    although the particular acts were not authorized or ratified.

12. APPEAL AND ERROR—REVIEW—VERDICT—AMOUNT OF RECOVERY.

    In actions in which there is no legal rule for the measure
    of damages, the allowance by the jury will not be disturbed as
    excessive, unless it is so flagrantly improper as to indicate
    prejudice or corruption in the jury, especially where the trial
    court has approved the award by denying a new trial.

13. CARRIERS—WRONGFUL EJECTION—EXCESSIVE DAMAGES—INJURIES
TO THE PERSON.

A passenger bound for San Francisco on a through ticket
was wrongfully ejected by the train agent, who humiliated
and insulted him by charging that he had stolen his ticket.
He was put off at the sidetrack in the desert, though the
company's agent knew that he was sick and did not have
enough money to pay his fare to his destination. After his
ejection, the district agent of the company refused to give him
transportation, and further insulted him. As a result, the
passenger was compelled to walk and ride in box and coal
cars for a considerable distance in inclement weather, in con-
sequence of which he contracted pneumonia, which resulted
in consumption, eventually causing his death, while the action
was pending. *Held*, that a verdict for $11,115, of which $1,115
was for railroad fare and medical and hospital bills, was not
so excessive as to require a reversal.

14. EVIDENCE—RES GESTÆ—WRONGFUL EJECTION OF PASSENGER.

Declarations made by a train agent while ejecting a
passenger, such as that "We put them off here, and they
sleep in box cars," and similar statements, are admissible as
part of the *res gestæ* in an action to recover damages for
wrongful ejection.

15. CARRIERS—PASSENGERS—WRONGFUL EJECTION—INSTRUCTIONS—
DEGREE OF CARE.

In an action for the wrongful ejection of a passenger who
had a ticket, and who was sick and unable to pay his fare to
his destination, an instruction that a common carrier of
passengers must exercise the highest practicable degree of
care the human judgment and foresight is capable of to make
the passenger's journey safe, is proper.

16. TRIAL—INSTRUCTIONS—CURE BY OTHER INSTRUCTIONS—AMOUNT
OF RECOVERY.

An instruction that the refusal of the agents of a carrier
to honor a ticket properly issued renders the company liable,
even though the agent was honestly mistaken concerning its
validity, is not erroneous as authorizing a recovery of exem-
plary damages for such an honest mistake, even though the
court had ruled that under the testimony exemplary damages
might be recovered, where the jury was also instructed that
if the ejection of a passenger was in good faith and with-
out malice or unnecessary force on the part of the railroad
servants, the company was not liable beyond the actual damage.

17. CARRIERS — CARRIAGE OF PASSENGER — WRONGFUL EJECTION —
DEFECTIVE TICKET.

Where a train agent falsely charged that a passenger had
stolen his ticket or bought it from a scalper, and ejected him
from the train, the company is liable for the ejection, even
though the ticket had been mistakenly punched as to the time
limit more than once, where none of the other punch marks

indicated a time limit subsequent to the purchase of the ticket as stamped on the back, and prior to the ejection from the train.

18. APPEAL AND ERROR—HARMLESS ERROR—INSTRUCTIONS.
   In an action for the wrongful ejection of a passenger holding such a ticket, an instruction requiring the company to exercise the highest degree of care, if 'erroneous, was harmless, since the company would be liable under such circumstances if only required to exercise ordinary care.

19. CARRIERS — CARRIAGE OF PASSENGERS — WRONGFUL EJECTION — DEFECTIVE TICKET—MISTAKE OF TICKET AGENT.
   A provision in a railroad ticket that it should be void if it showed any alterations, or if more than one date was canceled, does not relieve the carrier from liability for wrongfully ejecting a passenger upon whose ticket extra punch marks had been placed by the ticket agent.

20. CARRIERS — PASSENGERS — ACTION FOR WRONGFUL EJECTION — INSTRUCTION—APPLICABILITY TO EVIDENCE.
   An instruction that the face of a ticket is conclusive between the train agent and the passenger, and that the former is not bound to listen to explanations on the part of the passenger where the ticket is defective, but may eject the passenger if he refuses to pay fare, is not applicable in an action for the expulsion of a passenger from a train, where the ticket was sufficient to entitle him to transportation even though extra punch marks had been placed thereon by mistake.

21. CARRIERS—PASSENGERS—UNREASONABLE CONDITIONS—TICKET.
   A condition in a railroad ticket that in case of controversy the passenger agrees to pay the regular fare and apply for reimbursement at the office of the company, is unreasonable and void.

APPEAL from Second Judicial District Court, Washoe County; *W. H. A. Pike,* Judge.

Action by Mamie A. Forrester, administratrix of Dick Forrester, deceased, against the Southern Pacific Company. Judgment for plaintiff, and defendant appeals. **Affirmed.**

STATEMENT OF FACTS

Dick Forrester, a painter and paper hanger by trade, 27 years of age and married, purchased at Houston, Texas, from the Houston and Texas Central Railroad Company, acting for itself and as agent of the appellant, a railroad ticket entitling him to transportation from Houston to San Francisco over the lines of railroad of the selling company, its connecting lines, and over the appellant's

railroad from Ogden to San Francisco. While properly aboard one of appellant's passenger cars, en route from Ogden to his destination, and, according to the evidence on behalf of the plaintiff, after complying with different requirements and requests for the validation of the ticket, he was, on September 22, 1907, by the train agent of the appellant, insulted and humiliated in the presence of other passengers, deprived of his ticket upon the claim that he was not the purchaser, that he was not Forrester, or that he had stolen the ticket or obtained it from a scalper, and without his consent his suit case was searched, and he was finally ejected from the train at Montello, Nevada.

It is said by appellant's attorney that he was put off the train because the ticket contained too many punch marks, and because the agent was not satisfied with Forrester's attempts to identify himself by test signatures which differed in appearance from the signatures on the ticket. These signatures are before us, and appear to be in the same handwriting as the two signatures of Forrester upon his ticket. This is not denied.

For the respondent it is said no objection that the ticket contained too many punch marks was made by the train agent to Forrester. The train agent was authorized to confiscate tickets, and in addition to salary was allowed by appellant company a commission upon each invalid ticket taken up by him, and charged for improperly confiscating tickets.

At the time Forrester was expelled from the car he was ill, and his sickness was known to appellant's employees. "He was without means to purchase a ticket to continue to his destination, and was compelled to proceed to Reno, a distance of about 400 miles, where he had acquaintances, by riding upon cars in exposed situations, in inclement weather, and as a consequence he contracted pneumonia, and shortly after reaching Reno he was treated for pneumonia in the county hospital. The disease caused great and continued pain, suffering, and physical and mental distress. Afterwards he went to

Stockton, Cal., where he had friends and acquaintances, but his sickness there continued to develop, resulting in consumption."

This action was brought by him against the appellant in the district court at Reno, but before it was tried he died there, about five months after the time when he was ejected from the train. After his death his widow petitioned for letters of administration upon his claim against the appellant, which letters were granted to her by the district court at Reno, and on motion she was substituted as plaintiff in the case.

After such substitution there was a trial, and judgment and verdict in favor of the plaintiff for $11,115, of which $1,115 was for such items as fare, hospital, nursing, and physician's fees.

The answers made by witnesses to a few questions upon the trial give a better understanding of the facts in the case.

In his deposition, taken by stipulation at the request of appellant's counsel about twelve days before his death, and which was introduced on the trial, Forrester gave testimony regarding the taking of his ticket and his ejection from the train, in part as follows:

Q. What was that trouble? A. Well, the whole trouble, why, he comes around taking up tickets. I suppose he was a train detective or train agent; everybody was giving him his ticket. Then this conductor followed, checking hats; there was three of them. I don't know what the other man was. I gave him the ticket, and he takes it, and signs it, and gives it back to me, and then he says: "Wait a minute." He says: "Give me back your ticket." I took it and gave it to him, and he says: "Sign this piece of paper; this piece of card." He says: "Sign your name." He had forgotten to get me to sign it. I turned around and signed it in the window of the car. There were three men in the seat and it was crowded. I signed it and gave it back to him. He takes it and says: "Wait a minute." He went away and came back again. He went away two or three different times,

and he came back and says: "This ain't your ticket."
And I says: "It's my ticket." He said: "Where did you
get it?" I said: "I bought it in Houston, Texas, for $25."
He says: "Go on and tell the truth here," he says, "about
this thing. You either swiped this ticket, or got it from
the scalpers; tell the truth about it and go on and pay
your fare." He asked me the time I had had the ticket,
and I told him it had been taken up four days and four
nights about. "Well," he says, "you have got to get off,
and the ticket is no good; that isn't your name." Well, I
showed him, I never had any letters, but showed him some
union cards, a couple of working permits from Houston
that was made out within the same week I purchased my
ticket. I showed them to him, and he looked at them,
and gave them back. He said: "They don't belong to
you." I says: "I suppose they are good." I had a receipt
for money written on the back of one permit to be sent
to California for clearance card of different union, and of
course I showed him that, and he was mad. He got sore
and picked up my suit case, and went all through it look-
ing at my laundry marks. He began to talk louder and
got saucy. There were five or six men in the car takes
it up, and he got pretty tough. You know they took it
up on my behalf, so he finally says: "We put off five or
six men here every day." I says: "You do?" I says: "All
right, you will have to put me off. I paid my fare, that's
all there is to that." I had a fever at the time from
being changed in climate, and I told him: "I am not in
no condition to be put off, especially on a desert like
this, and I haven't got sufficient money to pay my way
across the desert, as it amounted to more than where I
started from, but I don't know exactly the fare from
there, Montello to San Francisco."

Q. What happened next? A. Well, the conductor then
he says: "Well, what are you going to do with this man?"
This fellow Lilly says: "Well, I will attend to that." He
takes my ticket and goes off. He says: "You get off at
Montello; you will find a box car there to sleep in." He
says: "We put them off here every day, five and six

and dozens of them. It is a good place for them."
Well, I told him he would have to put me off. I
wouldn't get off. He turned around to the conductor
and brakeman and takes my grip and slammed it back
together, and threw it in the aisle and said, when we get
to Montello, he says: "You get off this train." He turns
around to the conductor and brakeman and says that
"this man is to be put off at Montello," so he gets off at
the next station. He takes my ticket with him. A while
after he goes, the conductor came to me and he says:
"Why did you let him take your ticket away?" "Well,
you see, why don't you, he just reached over and pulled
it out of my hand and asked to look at it the third time."
The conductor then says: "You have got nothing now to
show the next conductor. You can't show anything that
you was ever on this train." I says: "All right, you fellows
just take hold of me and lead me to the door; that's all I
want." He says: "If we have to do that, we will." I says:
"All right, you do it." One got on each side of me. I
says: "You will have to take me and put me off"—and
he says: "All right, we are instructed to do that, and
we will have to do that." He says: "You have got no
ticket even to show the next man that you was ever
on this train," which I didn't have after this agent
had taken it up. Well, he led me to the door, and the
brakeman takes my grip and puts it off the train, and
sets it down, and helped me down off the car, and the
conductor says to me, he says: "You have got a fever;
you don't seem well." * * *

Q. After the train agent finally took your ticket from
you, did you ask him to return it to you? A. Yes, sir; I
asked him for a receipt for it, and he says: "No; you
don't need it, the ticket don't belong to you." Then he
says: "I will give you a receipt under a different name,
but not under the name of Dick Forrester."

Q. Now, what did he say when you asked him for the
ticket? A. He said: "No," the ticket belonged to him.

Q. He said: "No," the ticket belonged to him; did he
say then and there in a loud tone of voice that the ticket
was not your ticket? A. Yes, sir.

Q. Did he say that you did not buy it at Houston?
A. Yes, sir.

Q. Did he say the ticket didn't belong to you? A. Yes,
sir.

Q. Did he say that you had swiped it or had procured
it from the scalpers? A. Yes, sir.

Q. Did he say that your name was not Dick Forrester?
A. Yes, sir.

Q. Then he demanded that you sign your full name?
A. He did.

Q. Was that said in a loud or low tone of voice?
A. Loud voice.

Q. Could the other passengers hear that? A. Did
they? Yes, sir.

Q. Well, now how did you feel when he talked in
that way? A. Well, I felt that it wasn't anybody's
business.

Q. Did you feel insulted? A. I did. I had a right to.

Q. Did you feel mortified? A. I did.

Q. Now then when the conductor and brakeman put you
off of the train at Montello, what did they say, and what
did they do? A. Well, I told him— He said: "Come on
and get off; this is Montello"—and I says: "You got to
put me off; I can't get off of my own accord very well,
because I have been told by the passengers not to." So
one gets one arm and the other the other, and the brake-
man takes my grip and sets it on the outside; and they,
one on each side of me, leads me outside of the train.

The following appears in the testimony of James
Watson, one of the witnesses for the plaintiff, who was a
passenger in the car at the time:

Q. What, if anything, first attracted your attention to
Forrester? A. Why a man sitting in the aisle across
from me in the seat there, he looked to me as if some-
thing was wrong with him, sick or something, I don't
know.

Q. What was his appearance with reference to his state
of health at that time? A. Well, he looked sick to me,
and that was the reason I went over and spoke to
him.  *  *  *

Q. Now when he came back you say the train agent asked him to sign his name again? A. Yes, sir.

Q. What did Forrester do then? A. He signed it.

Q. And when he signed his name what did he do with the paper that he had signed? A. Why, the train agent had the ticket in his hand, a long ticket about that long (shows), and he says, "That ain't your name," and there were some threats in it, some threats that it was not right, and I can't recollect what the threats were now, and he said the ticket did not belong to him, and that he thought he had stolen the ticket, and that he would have to get off the train.

Q. What did Forrester say when he said—when the train agent said he stole the ticket? A. He said he would have to put him off. * * *

Q. What was the train agent's manner and tone of voice at the time that he accused Forrester of stealing the ticket? A. Why it was very loud and boisterous. * * *

Q. Just state what the train agent himself said. A. With reference to the ticket he made the remark: "We put them off here and they sleep in box cars." * * *

Q. What did Forrester do when the train agent made these remarks and accusations? A. You mean after he signed his name?

Q. No, I mean when the train agent directed these remarks to him, and accused him of stealing the ticket, and told him they put off passengers there and they slept in box cars? A. Well, he got nervous and kind of collapsed. I don't know what you would call it.

Q. Collapsed? A. Yes, sir.

A part of this testimony is contradicted by the train agent and the testimony of appellant.

This appeal is taken from an order denying defendant's motion for a new trial.

*C. R. Lewers* and *Lewers & Henderson,* for Appellant:

The court had no jurisdiction to appoint Mamie A. Forrester as administratrix, or to substitute her as plaintiff. (*In re Bailey's Estate,* 31 Nev. 377; *Mallory* v.

*Burlington Ry.*, 36 Pac. 1059; *Cushman* v. *Thayer Mfg. Co.*, 76 N.Y. 365.)

The right to attack the validity of an administrator's letters, in any action brought by him, on the ground that the court that appointed him did not have jurisdiction over the subject-matter, is sustained by the great weight of authority. (*Simmons* v. *Saul*, 138 U. S. 439; *Coe Brass Co.* v. *Savlik*, 93 Fed. 519; *Garrett* v. *Boeing*, 68 Fed. 51; *Holmes* v. *Oregon Ry.*, 5 Fed. 523; *Boston and Maine Ry.* v. *Hurd*, 108 Fed. 116; *Broughton* v. *Bradley*, 34 Ala. 694; *Matthews* v. *Douthitt*, 27 Ala. 273; *Moore* v. *Philbrick*, 32 Me. 102; *Ewing* v. *Mallison*, 70 Pac. 369; *Anderson* v. *Walter*, 99 Pac. 270; *Union Pac. Ry.* v. *Dunden*, 14 Pac. 501; *Davis* v. *Packard*, 6 Wend. 327; *Hoes* v. *New York Ry.*, 173 N.Y. 435, 66 N. E. 119; *Wales* v. *Willard*, 2 Mass. 120; *Cutts* v. *Haskins*, 9 Mass. 543; *Holyoke* v. *Haskins*, 9 Pick. 259; *Jochumsen* v. *Suffolk Bank*, 3 Allen, 90; *Gillett* v. *Needham*, 37 Mich. 143; *Quindart* v. *Pergeaux*, 18 N. J. Eq. 472; *Peoples Savings Bank* v. *Wilcox*, 15 R. I. 258, 3 Atl. 211; *Fisk* v. *Norvel*, 9 Tex. 13; *King's Estate*, 75 N.W. 657; *Nash* v. *Sawyer*, 87 N. W. 707; *Elgutter* v. *Mo. Pac. Ry.*, 74 N. W. 255; *Langworthy* v. *Baker*, 23 Ill. 484; *Fletcher's Admr.* v. *Sanders*, 7 Dana, 345; *Johnson* v. *Carpening*, 4 Iridell's Equity, 216; *Wall* v. *Wall*, 123 Pa. St. 545; *Sitzman* v. *Pacquette*, 13 Wis. 291.)

The entire action abated at the death of Dick Forrester. (*Wheatley* v. *Lane*, 1 Saunders, 216a, 85 Eng. Reprint, 228; Williams on Executors, 6th Am. ed. p. 867; *Henshaw* v. *Miller*, 17 How. 212; *Aldrich* v. *Howard*, 8 R. I. 125, 86 Am. Dec. 615; *Holmes* v. *Moore*, 5 Pick. 257; *Chase* v. *Fitz*, 132 Mass. 359; *Mason* v. *Union Pac. Ry.*, 24 Pac. 796.)

The real test is not whether the action is one of contract or tort, but whether the injury is personal to the deceased. (1 Cyc. 49; *In re Schreiber*, 110 U. S. 76; *Webber* v. *St. Paul Ry.*, 97 Fed. 145; *Gorman* v. *S. P. Co.*, 97 Cal, 1; *Denver Tramway Co.* v. *Cloud*, 40 Pac. 779; *Feary* v. *Hamilton*, 39 N. E. 516; *Smith* v. *Sherman*, 4 Cush. 408; *Chase* v. *Fitz*, 132 Mass. 359; *Corbett* v. *Twenty-third-St. Ry.*, 114 N. Y. 579; *Boor* v. *Lowrey*, 103 Ind. 468, 53 Am. Rep. 519; *Hess* v.

*Lowrey*, 122 Ind. 225; 17 Am. St. Rep. 355; *Zabriskie* v. *Smith*, 13 N. Y. 322, 64 Am. Dec. 551, 554; *Ward* v. *Blackwood*, 41 Ark. 295; *Aldrich* v. *Howard*, 8 R. I. 125, 86 Am. Dec. 615; *Lee's Admr.* v. *Hill*, 87 Va. 497, 24 Am. St. Rep. 666; *Ott* v. *Kaufman*, 11 Atl. 580; *Payne's Appeal*, 65 Conn. 397; *Fitzgerald* v. *Western Union Telegraph Company*, 15 Tex. Civ. App. 143.)

The common-law rules as to survival of actions have not been changed in any way by statute in Nevada. (Comp. Laws, 2950, 3111; *Grubb's Admr.* v. *Sult*, 32 Gratt. 203, 34 Am. Rep. 765; *Wade* v. *Kalbfleisch*, 58 N. Y. 282; *Gerling* v. *B. & O. Ry.*, 151 U. S. 673.)

These statutes are not intended to create new rights of action, but merely to regulate procedure and to prevent the necessity of bringing a new suit in cases where at common law the cause of action survived. (*Gerling* v. *B. & O. Ry.*, 151 U. S. 673; *Cunningham* v. *Sayre*, 21 W. Va. 440; *B. & O. Ry.* v. *Ritchie*, 31 Md. 191; *Petts* v. *Ison*, 11 Ga. 151; *Mason* v. *Union Pacific Ry.*, 24 Pac. 798.)

In California by statute punitive damages are allowed in "actions for the breach of an obligation not arising from contract." Under this statute it was held that an action for ejecting a passenger, although framed as a contract action, was "clearly in tort for breach of duty." (*Gorman* v. *S. P. Co.*, 97 Cal. 1; *Head* v. *Georgia Pac. Ry.*, 79 Ga. 358; *Denver Tramway Co.* v. *Cloud*, 40 Pac. 779.)

Punitive damages are not allowed in Nevada. There is no statute in this state authorizing the allowance of punitive damages, except possibly the death act (Comp. Laws, 3984) where it is said that damages "pecuniary and exemplary" may be given. This act was passed in 1871, and in the light of the early confusion in the use of the word "exemplary," as pointed out by Justice Hawley in *Quigley* v. *C. P. R. R.*, 11 Nev. 350, it is greatly to be doubted whether the legislature meant "exemplary" damages in the modern sense, but really intended to include compensatory damages not strictly "pecuniary."

At best, however, this statute can have no bearing on our case, as this is not an action under the death act. (*East Tenn. Ry.* v. *King*, 81 Ala. 177, 2 South. 152.) We

are therefore left to the common law alone to determine whether punitive damages may be allowed. If the true principles of the law, interpreted historically and logically, do not permit such damages, then this court has no power to permit them. This question came before this court in 1876, in the case of *Quigley* v. *C. P. R. R.*, 11 Nev. 350. This was an action very similar in its facts to our own case. Justice Hawley discusses and quotes the case of *Fay* v. *Parker*, 53 N. H. 342, the leading case denying punitive damages, with quite apparent approval, and he also points out the fact that the term "exemplary" had been quite generally used in reference to actual damage. His entire opinion, in fact, is consistent only with the view that such damages cannot be allowed. Justice Beatty, in his concurring opinion, follows the same general line of argument, but does not hesitate to definitely express his opinion at page 376.

This conclusion is amply sustained by authority ancient and modern. Blackstone defines damages as the money "given to a man by a jury as a compensation or satisfaction for some injury sustained." (2 Bl. Comm. 438.) Lord Denman, in *Fillites* v. *Phippond*, 12 Jur. 202, 204, said: "The principle on which actions are maintainable is not the punishment of guilty persons but compensation to innocent sufferers." As is pointed out in the elaborate discussion in *Fay* v. *Parker*, the idea of strictly punitive damages was entirely unknown to both the civil law and the early common law. To the same effect and holding that such damages cannot now be allowed, see 2 Greenleaf on Ev. sec. 253 and long note; *Fay* v. *Parker*, 53 N. H. 270, 16 Am. Rep. 270; *Hendrickson* v. *Kingsbury*, 21 Iowa, 379; *Barnard* v. *Poor*, 21 Pick. 379; *Bayer* v. *Barr*, 8 Neb. 68; *Detroit Daily Post* v. *McArthur*, 16 Mich. 447; *Welch* v. *Ware*, 32 Mich. 84; *Murphy* v. *Hobbs*, 7 Colo. 541; *Pegram* v. *Stortz*, 31 W. Va. 220; *Spokane Truck Co.* v. *Hoefer*, 25 Pac. 1072; *Ford* v. *Cheever*, 105 Mich. 679; *Meidel* v. *Anthis*, 71 Ill. 241; *Ratheree* v. *Chapman*, 79 Ga. 574; *Brown* v. *Swineford*, 44 Wis. 282.

Punitive damages are not recoverable in this action. Conceding, for the purpose of argument, that punitive

damages may be recovered in this state in a proper case, they cannot be recovered in this action.

If punitive damages are anything, they are purely personal. They were not part of the estate or property of Forrester when the cause of action arose. On no theory that has been suggested in any case can they survive. And it is uniformly held that such damages do not survive the death of the wrongdoer. (*Welch* v. *Ware,* 32 Mich. 84; 13 Cyc. 113, 120; *Lexington Ry.* v. *Lyons,* 104 Ky. 23, 46 S. W. 209.)

The facts of this case as shown by the entire record could not possibly warrant punitive damages. All that appears is that the train agent refused to accept the ticket offered by Forrester on the ground that the ticket had too many punch marks and because he was not satisfied with the identification of Forrester. There were no circumstances of fraud, oppression, malice, gross wrong or wantonness of any sort. No force was used in putting Forrester off. Punitive damages can be given only where something closely akin to criminality is present. Here nothing of the kind existed. All the evidence indicates that the train agent was endeavoring to enforce a rule of the company requiring him to take up bad tickets. The fact that he was mistaken, or even that he should have known he was mistaken, could make no difference. In such a case no punitive damages can be allowed. (*Quigley* v. *C. P. R. R.,* 11 Nev. 350; Sutherland on Damages, sec. 393; *Atchison, T. & S. F. Ry.* v. *Hogue,* 31 Pac. 698; *Railroad Co.* v. *Gants,* 39 Kan. 608; *Paine* v. *Ry. Co.,* 45 Iowa, 569; *Denver Tramway Co.* v. *Cloud,* 40 Pac. 779; *Lyles* v. *Perrin,* 51 Pac. 332; *Inman* v. *Ball,* 65 Iowa, 543; *Alabama Ry. Co.* v. *Arnold,* 84 Ala. 159; *Hamilton* v. *Third Ave. Ry. Co.,* 53 N. Y. 25; *Ward* v. *Blackwood,* 41 Ark. 295; *Hoffman* v. *Northern Pac. Ry.,* 45 Minn. 53; *Phila. Traction Co.* v. *Orbann,* 119 Pa. 37; *Vicksburg Ry.* v. *Marlett,* 78 Miss. 872, 29 South. 62; *McGhee* v. *Reynolds,* 117 Ala. 413, 23 South. 68.)

There was no authorization or ratification by defendant. If we are to allow punitive damages at all, it must be as a punishment to the wrongdoer. Therefore, they cannot

be imposed on a principal, whether a natural person or a corporation, who did not either direct the oppressive or wanton conduct or afterwards ratify it with knowledge. (*Lake Shore Ry.* v. *Prentice*, 147 U. S. 101; *Warner* v. *S. P. Co.*, 113 Cal. 112, 34 Pac. 187; *Turner* v. *Railroad Co.*, 34 Cal. 594; *Hagan* v. *Railroad Co.*, 3 R. I. 88; *Craker* v. *Chicago Ry.*, 36 Wis. 657, 17 Am. Rep. 504; *Cleghorn* v. *N. Y. Ry.*, 56 N. Y. 47, 15 Am. Rep. 375; *Jeffersonville Ry.* v. *Rogers*, 28 Ind. 1, 92 Am. Dec. 276; *Allegheny Valley Ry.* v. *McLain*, 91 Pa. St. 442; *Hays* v. *Houston Ry.*, 46 Tex. 272; *Ricketts* v. *Chesapeake Ry.*, 33 W. Va. 433, 25 Am. St. Rep. 901; *Hill* v. *New Orleans Ry.*, 11 La. Ann. 292; *Edelman* v. *St. Louis Transfer Co.*, 3 Mo. App. 503; *Ackerson* v. *Erie Ry. Co.*, 32 N. J. L. 254; *Sullivan* v. *Oregon R. R. Co.*, 12 Or. 393, 7 Pac. 508; *Norfolk Ry.* v. *Lipscomb*, 90 Va. 146, 17 S. E. 809; *Pullman Palace Car Co.* v. *Lawrence*, 74 Miss. 804, 22 South. 53.)

The damages are excessive. The allowance of $10,000 as a punishment was clearly excessive. If allowable at all, it could be allowed only for the acts of the train agent before and at the time Forrester was put off the train. The consequences which followed, no matter how serious, cannot be considered.

In cases where punitive damages are excessive in themselves, or out of all proportion to the actual damage, they may be set aside. (*Saunders* v. *Mullen*, 66 Iowa, 728, 24 N. W. 529; *Louisville Ry.* v. *Monogue*, 90 Ky. 369, 14 S. W. 357; *McCarthy* v. *Niskern*, 22 Minn. 90; *Railroad Co.* v. *Telephone Co.*, 69 Tex. 277, 5 Am. St. Rep. 45; *Boardman* v. *Goldsmith*, 48 Vt. 403.)

*J. B. Dixon* and *Summerfield & Curler*, for Respondent:

That the lower court had no jurisdiction to appoint Mamie A. Forrester as administratrix of her deceased husband's estate constitutes a purely collateral attack on the letters of administration granted to respondent.

The lower court had jurisdiction to grant respondent letters of administration. (Stats. 1905, p. 249; *Coyne* v. *S. P. Co.*, 155 Fed. 684; *Nonce* v. *Richmond Co.*, 33 Fed. 435.) A right of action for the negligent killing of a person

is an asset sufficient to warrant the appointment of an administrator for his estate. (*Jordan* v. *Chicago Ry. Co.*, 1 L. R. A. n.s. 885; *In re Mayo*, 38 S. E. 634; *Friedley* v. *Chicago Ry. Co.*, 64 N. W. 733; *Hutchins* v. *St. Paul Ry. Co.*, 46 N. W. 79.)

An action to recover damages for personal injuries sustained in Nevada is no longer a common-law action but is a statutory action. (Stats. 1905, p. 249.)

There is no escape from the meaning of this statute. It is the absolute equivalent of saying that if an action of this kind is brought by the injured person in his lifetime in a court of competent jurisdiction in this state, the action exists until the liability is ascertained and adjudged by such court. (1 Woerner, Am. Law of Ad. 2d ed. sec. 292; *Hooper* v. *Gorham*, 45 Me. 209, 212; Comp. Laws, 2951.)

That the present action was founded upon contract we think admits of no doubt. The violation of this contract by appellant was the foundation of all complaint in the premises. When Nevada and certain other states passed death acts, modeled upon the Lord Campbell act, they expressly authorized the recovery of exemplary damages. (Tiffany, Death by Wrongful Act, sec. 155.)

The common law did permit the allowance of exemplary damages in proper cases, when the injured party survived, and our law-making power deemed it proper to allow such damages in cases brought under the death act, notwithstanding the fact that the common law permitted no action for damages whatever for wrongful death.

It is argued that this court, in *Quigley* v. *C. P. R. R. Co.*, 11 Nev. 350, so framed its decision that it "is consistent only with the view that such damages cannot be allowed." We do not so read the decision, but read it to the contrary. We submit the trend of the decision is favorable to the allowance in a proper case of exemplary damages.

The United States Circuit Court for the District of Nevada has expressed an unqualified opinion that exemplary damages in a proper case may be awarded. (*Brown* v. *Evans*, 17 Fed. 912.)

Respondent does not claim that this action is a contract action. We claim that it is founded upon contract—the contract of carriage. There is a vast difference between an action to enforce contractual rights and an action to recover damages for injuries sustained where the foundation of the claim was a breach of contract.

The acts of its train agent, Lilly, were ratified by appellant. Its district train agent, Young, upon receiving the dispatch advising him that the ticket was all right, and requesting authority to allow Forrester to proceed to his destination, refused such authority, and declared Forrester to be "bogus." (*Goddard* v. *Grand Trunk Ry.*, 57 Me. 202; Watson on Damages for Personal Injuries, secs. 717, 718, and authorities cited.)

Prior to the American revolution punitive damages were allowed in England. (*Lake Shore Ry.* v. *Prentice*, 147 U. S. 101.)

It necessarily follows that in Nevada punitive damages are allowable by reason of our adoption of the English common law as a rule of decision.

When antecedent authority emanates from a principal to an agent to do an act, which with its attendant consequences is the subject of complaint, neither direction nor ratification are necessary to make the principal answerable for exemplary damages. Such is unquestionably the prevailing rule of law. (*Kline* v. *C. P. R. R. Co.*, 37 Cal. 400; *McKinley* v. *Chicago Ry. Co.*, 44 Iowa, 314; *Clegham* v. *N. Y. Cent. Ry. Co.*, 50 N. Y. 47; *Sullivan* v. *Oregon Ry. Co.*, 12 Or. 392; *Houston Ry. Co.* v. *Cowser*, 57 Tex. 293; *Downey* v. *Chesapeake R. Co.*, 28 W. Va. 732; *Robinson* v. *Superior Ry. Co.*, 94 Wis. 346; *Redwood* v. *Metropolitan R. Co.*, 6 D. C. 302.)

The amount of punitive damages in any given case is particularly within the discretion of the jury, depending upon the particular circumstances surrounding each case. (*Day* v. *Wordsworth*, 13 How. 363; *Voltz* v. *Blackmor*, 64 N. Y. 440; *Farwell* v. *Warren*, 70 Ill. 28; *Louisville Ry. Co.* v. *Ballard*, 85 Ky. 307; *Chicago Ry. Co.* v. *Scurr*, 59 Miss. 456; *Foster* v. *Pitts*, 63 Ark. 387; *Canfield* v.

*Chicago Ry. Co.*, 59 Mo. App. 354; *Webb v. Gillman*, 80 Me. 177; *Rosland* v. *Barrett*, 76 Va. 128; *Rogers* v. *Henry*, 32 Wis. 327.)

By the Court, TALBOT, C. J. (after stating the facts):

1. Any conflict in regard to the testimony was for the jury, and the facts may be regarded as shown by the substantiated evidence for the plaintiff. (*Lowman* v. *Bank*, 31 Nev. 306; *Murphy* v. *So. Pac. Co.*, 31 Nev. 120, 21 Ann. Cas. 502; *Sultan* v. *Sherwood*, 18 Nev. 454; *McGurn* v. *McInnis*, 24 Nev. 370; *New Jersey Steamboat Co.* v. *Brockett*, 121 U. S. 637, 7 Sup. Ct. 1039, 30 L. Ed. 1050.)

In the able briefs and arguments of respective counsel the contentions of the parties have been clearly presented. On behalf of the appellant it is urged that the entire action abated on the death of Dick Forrester; that the court had no jurisdiction to appoint Mamie A. Forrester as administratrix, or to substitute her as plaintiff; that punitive damages are not allowed in Nevada, and are not recoverable in this action; that the damages are excessive; and that the court erred in the admission of hearsay testimony and in the giving and refusing of instructions.

2. The attack upon the letters of administration is purely collateral. If it be admitted that such attack may be made when the court is without jurisdiction, we conclude it cannot avail here, because under the facts shown the court had jurisdiction to grant the letters. Reliance is placed upon the opinion in *Re Bailey's Estate*, 31 Nev. 378, Ann. Cas. 1912A, 743. Aside from the holding there that letters may be granted to a nonresident, the facts are distinguishable. Bailey was killed by the explosion of an engine in Lincoln County, and left no property except a gold watch and ring and a little money on his person, and a right of action for damages for his alleged wrongful death. Letters were issued in a different county, and the decision was in a direct proceeding to have them set aside. No question was presented similar to the one raised here as to whether the

district court may grant letters of administration in the county in which a person dies, upon his estate consisting of a pending suit brought by him in that county for breach of contract or damages.

**3.** For respondent it is claimed that the action, being one to recover damages sustained in Nevada, is statutory, and did not abate on the death of Dick Forrester, that letters of administration were properly issued, and that the respondent is entitled to recover under the following statutes:

"SECTION 1. Whenever any person shall suffer personal injury by wrongful act, neglect or default of another, the person causing the injury shall be liable to the person injured for damages; and where the person causing such injury is employed by another person or corporation responsible for his conduct, such person or corporation so responsible shall be liable to the person injured for damages.

"SEC. 2.   Such liability, however, where not discharged by agreement and settlement, shall exist only in so far as the same shall be ascertained and adjudged by a state or federal court of competent jurisdiction in this state in an action brought for that purpose by the person injured." (Stats. 1905, p. 249.)

"SEC. 165.   Actions for the recovery of any property, real or personal, or for the possession, and all actions founded upon contracts, may be maintained by and against executors and administrators in all cases where the same might have been maintained by or against their respective testators or intestates in their lifetime." (Comp. Laws, 2951.)

We are also cited to the following cases, which hold that the right of action for the negligent killing of a person is an asset of his estate, and warrants the appointment of an administrator: *Jordan* v. *Chicago Ry. Co.*, 125 Wis. 581, 104 N.W. 803, 1 L. R. A. n.s. 885, 110 Am. St. Rep. 865, 4 Ann. Cas. 1113; *In re Mayo*, 60 S. C. 401, 38 S. E. 634, 54 L. R. A. 660; *Findlay* v. *Chicago Ry. Co.*, 106 Mich. 700, 64 N.W. 733; *Hutchins* v. *St. Paul Ry. Co.*,

44 Minn. 5, 46 N.W. 79. In the note, 1 L. R. A. n.s. 885, it is said that this proposition is sustained by the preponderance of the authorities, and that the right to make collateral attack on the appointment of an administrator on the ground that there were no assets to sustain such appointment is denied in most of the decisions, as cited in the note in 18 L. R. A. 243.

If the deceased left any claim or right of action in the pending suit, we see no reason why it should not be regarded as property, nor why letters of administration may not be granted upon it in the county in which the case is pending if he is a nonresident and leaves no other property in the state. If it be conceded that there is also a right of action in California, this would not make the appellant liable for damages, for as in ordinary rights of action between individuals upon which suits may be brought in different states the judgment of the court first taking jurisdiction may be pleaded as a bar to further recovery. If no right of action survived, this would be a complete defense for the appellant, without attacking collaterally, or otherwise, the letters of administration. The right of action was a transitory one, and the action pending in Washoe County at the time of Forrester's death there was property upon which letters of administration could be issued.

In the case of *Pyne, Administrator of the Estate of Henry C. Austin, Deceased,* v. *Railway Company,* 122 Ky. 304, 91 S. W. 742, 5 L. R. A. n.s. 756, Austin, a citizen of Indiana, was injured by being run over by an engine in Jeffersonville, Ind. He brought suit in Kentucky to recover damages for the injury, which he claimed was caused by the gross negligence of the company's servants in charge of the engine. Some time after this suit was filed, and while still residing in Indiana, he died. Aside from the suit or cause of action, he owned no property in Kentucky. An administrator was appointed in Kentucky, and the suit was revived in his name. The company defended, denied negligence, pleaded contributory negligence, and alleged that at the time of his death Austin was a resident of Jeffersonville, Ind.; that he

owned no estate of any kind in Kentucky, and had no debt owing to him in Kentucky. It was also asserted as a defense by the company that the injury occurred in Indiana, the cause of action arose under the laws of that state, and that it was provided by the statute in Indiana that: "A cause of action arising out of an injury to the person dies with the person of either party, except in cases in which an action is given for an injury causing the death of any person and actions for seduction, false imprisonment, and malicious prosecution."

The statutes of Kentucky provided that letters of administration might be granted in that state in the county where the decedent died, or where his estate or part thereof shall be, or where there may be any debt or demand owing him. The court said: "Construing these sections, it has been held that where a nonresident has been killed in this state by the tort of another, administration will be granted upon his estate in this state, even for the sole purpose of suing to recover damages for the tort, because the statute which gives the right of action to the estate of such decedent for such death, *ex necessitate rei*, confers jurisdiction, by implication, to appoint an administrator to prosecute the suit. (*Brown* v. *Louisville & N. R. Co.*, 97 Ky. 228, 30 S. W. 639.) It has also been held that where a resident of this state is killed by the tort of another out of this state, administration may be granted upon his estate in this state. But it has been held, also, that where a nonresident of this state is killed by the tort of another out of the state, and who has not estate or property in this state, there cannot be administration granted upon his estate in this state. (*Hall* v. *Louisville & N. R. Co.*, 102 Ky. 484, 43 S.W. 698, 80 Am. St. Rep. 358; *Turner* v. *Louisville & N. R. Co.*, 110 Ky. 879, 62 S.W. 1025.) * * * Whether an action should survive to the personal or real representatives of the plaintiff is a matter of policy to be settled for itself by each state. It goes to the remedy alone, and does not really affect the cause of action as being actionable. Such remedies are not extraterritorial. Generally the remedy is governed by the law of the forum,

and not by the *lex loci.* As the plaintiff's cause of action
accrued to him, not by the statute of Indiana, but under
the common law, prevailing there as it does here, when
he sued upon it in this state, whether upon his death
before the termination of the suit, it would be allowed
his personal representative to continue to prosecute it,
affects the remedy only, and is a matter wholly within
the control of the state where the suit is pending.
(*Baltimore & O. R. Co.* v. *Joy*, 173 U. S. 226, 19 Sup. Ct.
387, 43 L. Ed. 677.) In this state, as we have seen, the
cause of action is permitted to survive, and a revivor in
the name of the personal representative of the decedent
is allowed."

In the Joy case the United States Supreme Court held
that the right of an administrator to revive and continue
an action for personal injuries commenced before the
death of the person injured, is controlled by the law of
the place where the action is pending, and not by the law
of the state where the injury occurred and the cause of
action arose; that an action brought in Ohio by the
injured person to recover damages for injuries sus-
tained by the negligence of the defendant in Indiana
does not abate upon the death of the person injured,
but may be continued by his administrator appointed in
Ohio, although if no suit had been brought the action
would have abated both in Indiana and Ohio, and if suit
had been brought in Indiana the action would have
abated in that state. The following is the last para-
graph of the opinion in that case: "It is scarcely neces-
sary to say that the determination of the question of the
right to revive this action in the name of Hervey's per-
sonal representative is not affected in any degree by the
fact that the deceased received his injuries in the State
of Indiana. The action for such injuries was transitory
in its nature, and the jurisdiction of the Ohio court to
take cognizance of it upon personal service or on the
appearance of the defendant to the action cannot be
doubted. Still less can it be doubted that the question
of the revivor of actions brought in the courts of Ohio
for personal injuries is governed by the laws of that

state, rather than by the laws of the state in which the injuries occurred."

In *Martin* v. *Wabash Ry. Co.*, 142 Fed. 650, 73 C. C. A. 646, 6 Ann. Cas. 582, it was held that an action for personal injuries survived under the statute of Illinois, and the court said: "Whether a cause of action survives by law is not a question of procedure, but of right, and is determinable when the action is one arising at common law, not by the law of the state where the injuries were inflicted, but by the law of the state where the action is brought. (*Martin, Admr.*, v. *Baltimore and Ohio R. R. Co.*, 151 U. S. 691, 14 Sup. Ct. 533, 38 L. Ed. 311; *Baltimore and Ohio R. R. Co.* v. *Joy*, 173 U. S. 226, 19 Sup. Ct. 387, 43 L. Ed. 677.)"

In *Webber* v. *St. Paul City Ry. Co.*, 97 Fed. 140, 38 C. C. A. 79, it was held that an action for personal injuries did not abate on the death of the person injured, under the statute of Minnesota. It is said in the opinion: "There is nothing in the statute to the effect that a cause of action *ex contractu*, arising out of an injury to the person, shall survive, while such a cause *ex delicto* shall abate. In order to sustain the contention of counsel for the plaintiff in error, it is necessary to ingraft a sweeping exception upon the act of the legislature, so that it will read: 'A cause of action arising out of an injury to the person dies with the person, except in cases in which the injury was the breach of a contract.' * * * When the legislature has lawfully established a rule which limits the time or manner of maintaining a class of actions, and has made no exception to that rule, the conclusive presumption is that it intended to make none, and the courts have no power to do so. (*Madden* v. *Lancaster Co.*, 27 U. S. App. 528, 539, 12 C. C. A. 566, 573, and 65 Fed. 188, 195; *McIver* v. *Ragan*, 2 Wheat. 25, 29, 4 L. Ed. 175; *Bank of State of Alabama* v. *Dalton*, 9 How. 522, 528, 13 L. Ed. 242; *Vance* v. *Vance*, 108 U. S. 514, 521, 2 Sup. Ct. 854, 27 L. Ed. 808.) * * * Counsel for the respective parties to this action have presented a careful and exhaustive review of the decisions of the English and American courts upon the rule of the

common law that a personal action dies with the person. But the statute of Minnesota is so plain and positive in its terms that we do not feel at liberty to disregard, evade, or explain it away, and we must decline to follow them in this discussion. * * * When the language of a statute is unambiguous, and its meaning is clear, arguments by analogy or from history and attempted judicial construction serve only to create doubt and to confuse the judgment. They serve to obscure far more than to elucidate the meaning of the law. There is no safer or better canon of interpretation than that, when the terms of a statute are plain and its meaning is clear, the legislature must be presumed to have meant what it expressed, and there is no room for construction. (*Knox County* v. *Morton,* 32 U. S. App. 513, 516, 15 C. C. A. 671, 673, 68 Fed. 787, 789; *U. S.* v. *Fisher,* 2 Cranch, 358, 399, 2 L. Ed. 304; *Railway Co.* v. *Phelps,* 137 U. S. 528, 536, 11 Sup. Ct. 168, 34 L. Ed. 767; *Bedsworth* v. *Bowman,* 104 Mo. 44, 49, 15 S. W. 990; *Warren* v. *Paving Co.,* 115 Mo. 572, 576, 22 S. W. 490; *Davenport* v. *City of Hannibal,* 120 Mo. 150, 25 S. W. 364.)"

In *Atchison, Topeka and Santa Fe R. R. Co.* v. *Sowers,* 213 U. S. 55, 29 Sup. Ct. 397, 53 L. Ed. 695, it was decided that an action brought by a resident of Arizona for an injury sustained in New Mexico could be maintained in Texas, notwithstanding the statute of New Mexico, which by its terms would restrict the bringing of the action to the courts of New Mexico; and it was held that the rights of action which exist regardless of statute, such as rights of action for personal injuries, are maintainable wherever courts may be found that have jurisdiction of the parties and the subject-matter, when not inconsistent with any local policy, and that no state can pass laws having force over persons and property beyond its jurisdiction. The court said: "An action for personal injuries is universally held to be transitory, and maintainable wherever a court may be found that has jurisdiction of the parties and the subject-matter. (Rover

on Interstate Law, 154, 155; *McKenna* v. *Fisk*, 1 How.
242, 11 L. Ed. 117; *Dennick* v. *Railroad Co.*, 103 U. S. 11,
18, 26 L. Ed. 439.)"

In *Christensen* v. *Floriston Pulp and Paper Co.*, 29 Nev.
552, we held that a right of action for damages for death
resulting from personal injuries suffered in California
was transitory, and that a suit for their recovery could
be maintained in this state.

**4.** In the construction given to our act of 1905 by the
United States Circuit Court for Utah (*Coyne* v. *Southern
Pacific Company*, 155 Fed. 683), the question regarding
whether an action like the present one survives was not
before the court, and it is not assumed that consideration
was given to the question before us for determination.

**5.** We have high regard for the decisions of the federal
courts, and when they construe federal laws they are
binding upon the tribunals of the different states. On
the other hand, the federal courts follow the decisions of
the highest court of a state construing the constitution
and laws of a state, unless they conflict with the United
States constitution or federal laws, notwithstanding that
the federal court may believe that the opinion of the
state court is improper. (*N. Y. Cent. R. Co.* v. *Miller*,
202 U. S. 584, 26 Sup. Ct. 714, 50 L. Ed. 1155; *Union
National Bank* v. *Railway Co.*, 163 U. S. 331, 16 Sup. Ct.
1039, 41 L. Ed. 177; *Bacon* v. *Texas*, 163 U. S. 221, 16 Sup.
Ct. 1023, 41 L. Ed. 132; *Supreme Lodge* v. *Meyer*, 198 U. S.
508, 25 Sup. Ct. 754, 49 L. Ed. 1146.)

Although some courts with judges trained in the
principles of the common law have declined to give a
liberal construction to statutory enactments which are
derogatory to and would overturn common-law principles,
and in some instances may have been inclined to adhere
to the rule that actions for damages resulting from torts,
even when coupled with breach of contract, did not
survive, notwithstanding statutory provisions, we con-
clude that the language of the sections before quoted
include the cause of action alleged in this case. As these

statutes provide that "all actions founded upon contracts may be maintained by and against executors and administrators in all cases where the same might have been maintained by or against their respective testators or intestates in their lifetime," and that persons causing another to suffer personal injury by neglect or default shall be liable for damages in an action brought by the person injured, and as the injury here arose from the neglect and default of the defendant to keep its contract, and there is nothing in the words used excepting actions founded upon a tortious breach of a contract, and as this action is founded upon contract and is transitory and was properly brought and maintained by the person injured, the decedent, in his lifetime, it follows that it may be continued by his administratrix.

6. It is not the duty of the court to hold that the legislature did not mean what the language clearly indicates, or did not intend that this statute which they had taken the time to enact should have some effect different from the law existing at the time it was passed, or that cases which did not survive at common law should be excluded from the operation of the statute if they come within the ordinary meaning of the words employed.

7. Notwithstanding the argument that the cause of action should be treated as one in tort which abated upon the death of Forrester, the injury and damage to Forrester and his hardships and suffering while trying to reach his destination resulted from the failure of defendant to comply with its contract for carriage, as evidenced by the ticket sold to Forrester, and the insulting and humiliating words and conduct of the agent of the defendant at the time he ordered him to leave the train were inseparably connected with the breach of the contract by the defendant company. If this were not so, we would still be unable to escape the conclusion that the action is founded upon contract, for if Forrester had not obtained, possessed, or paid for the ticket, which was undoubtedly a contract, or paid fare, the payment of which would in effect be a contract, the company would have been authorized to eject him from the train.

In *Samuels* v. *New York City Ry. Co.*, 52 Misc. Rep. 137, 101 N. Y. Supp. 534, the court said: "If the plaintiff's story is true, he was grossly assaulted, wantonly insulted, and wrongfully ejected from the defendant's car by its servant. * * * On this evidence the defendant clearly committed a breach of its contract of carriage, for which the plaintiff is entitled to recover substantial damage, even though he proved no loss of wages or of time, or physical injuries. He is entitled to recover compensatory damages for injury done to his feelings, and for the indignity suffered. (*Hamilton* v. *Third Ave. R. R. Co.*, 53 N.Y. 25; *Gillespie* v. *Brooklyn Heights R. R. Co.*, 178 N.Y. 347, 70 N. E. 857, 66 L. R. A. 618, 102 Am. St. Rep. 503; *Hines* v. *Dry Dock*, 75 App. Div. 391, 78 N.Y. Supp. 170.)"

If the action were not based upon the ticket contract both by allegation and proof, it may be assumed that the defendant would have demurred or moved for a nonsuit, because the plaintiff could not recover for being ejected from the train when traveling without a ticket or payment for passage amounting to a contract, when, as in this case, no more force was used than was necessary to remove Forrester from the car, and such removal constituted a breach of contract of carriage. If the action were for some insult, assault, or tortious act of the train agent not connected with the breach of the contract, and Forrester had been given passage in compliance with the terms of the ticket, the provision of the statute for the survival of all actions founded upon contract would not apply.

Cases may arise, and have arisen, in which damages would be recoverable purely in tort for the expulsion of a person from a train when traveling without a ticket or the payment of a fare, with the right of the company to eject him in the absence of a contract or obligation of passage. If a person without a ticket or right to be carried were injured by being put off a moving train, or on a bridge or desert, under circumstances of unusual hardship, damages would be recoverable for injuries sustained, but an action for their recovery would not be based upon contract.

**8.** If damages for a tortious breach of a contract are recoverable by the party injured, it was within the power of the legislature to provide that an action commenced by him for their recovery should not abate upon his death. Some states have statutes providing that all causes of action survive, others that all causes of action with specified exceptions survive, and others that certain specified actions survive. Under these statutes actions survive notwithstanding they would abate at common law.

In *Melzner* v. *N. P. Ry. Co.*, 41 Mont. 162, 17 Pac. 148, it was urged under the citation of cases that the Montana statute providing for the survival of actions did not affect the abatement of an action for personal injury, and applied only to actions which survived at common law. It was held that the suit, which was purely in tort for injuries to a boy from being struck by a locomotive, survived, and that the damages could be recovered by his administrator.

We should not adhere too closely to common-law distinctions or obsolete methods of pleading abolished by our code which might result in a denial of the right to recover damages for any injury inflicted. The statutes control, regardless of the common-law principles under which actions for tort abated, and exemplary damages were not recoverable in actions on contract or in tort after the death of the person injured. The legislature long ago abolished the distinction in the forms of action, and in later passing the statutes we have quoted may not have intended to carry the common-law distinctions not mentioned as exceptions to the statute which if allowed to control would leave the statutes without any force in this case. A liberal view in regard to the form of the action for expulsion of a passenger was taken by the court in *Railway Co.* v. *Brauss*, 70 Ga. 368, and in *Railroad Co.* v. *Hine*, 121 Ala. 234, 25 South. 857.

**9.** If exemplary damages are allowable at all, there is no good reason why, if warranted by statute, and there is wantonness, oppression, and hardship, they should not

be recoverable in an action for the tortious breach of a contract, or in a case where the passenger has bought a ticket or paid his fare, and is injured by failure of the company to keep its contract of carriage, as well as if he were injured by a tort in no way connected with the breach of a contract, or were expelled from the train with undue force, or under unwarrantable circumstances, when the company had a right to eject him for nonpayment of fare. Under our statutes such an action brought by the person injured and based on contract survives. The damage resulted from the failure of the company to perform its duty and keep its contract, and if exemplary damages are allowable, against public carriers as a warning or punishment, and to prevent a repetition of practices injurious to people traveling, they should be allowed under our statute for a wanton and oppressive breach of carriage, and to prevent railroad companies from ejecting passengers who are entitled to transportation.

Although railroads, as the best means for the convenient and speedy transportation of passengers and commodities, are among the most important factors in the progress and prosperity of the civilized world, and when properly managed are of great service and benefit, they are not without their obligations to the public. Many of the great railway systems of the country were built with the aid of government, state and municipal land grants and subsidies, and all of any importance depend upon or exist under public laws providing for incorporation, franchises, and condemnation of private property for right of way. From the profits of these roads, collected from the public, they have been improved and extended, and other roads have been built. Also, it is with money collected from the public that the railroad companies are enabled to pay high salaries and compensation to officers, attorneys, political agents, and other talented and skilful men to manage the business of the railroad companies, so that the best dividends may be paid and the largest revenues may be collected from the public, which is dependent upon the roads for transportation.

It has long been settled by the courts of the country, including the highest, that when the rates fixed by the railroad companies are excessive they may be regulated or reduced by public authority. It must also be conceded that a railroad is liable for damages for failure to comply with its contract, or the terms of the ticket which it has sold. The passenger, whether traveling in a special car or on a first- or second-class ticket, is entitled to be carried to his destination without being insulted or subjected to discourteous treatment by the employees of the company. We have heretofore held that railroad companies are bound to the highest degree of care for the safety and protection of passengers, and are responsible for the slightest negligence or want of skill in either themselves or their servants. (*Murphy* v. *Southern Pacific Co.*, 31 Nev. 125, 21 Ann. Cas. 502; *Sherman* v. *Southern Pacific Co.*, 33 Nev. 404, and cases cited.)

In view of the amount of the verdict and the important principles of law involved, we have given careful consideration to the contentions of the appellant "that punitive damages are not allowable in any case under the established principles of the law," and particularly that this is so in Nevada under the case of *Quigley* v. *C. P. R. R.*, 11 Nev. 350, 21 Am. Rep. 757, "that if punitive damages may be recovered in this state in a proper case, they cannot be recovered in this action," and that the company is not liable for the act of the agent in ejecting Forrester from the train.

In considering objections to the allowance of punitive damages, the Supreme Court of Kansas, in *Cady* v. *Case*, 45 Kan. 733, 26 Pac. 448, said: "The principal question discussed in this case upon the argument was whether exemplary damages ought to be allowed in any civil action, and we are asked to reexamine this question, and reverse the prior decisions of this court permitting exemplary or vindictive damages. Our own decisions for a long time have established that, whatever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, the law allows the jury to give what

is called exemplary or vindictive damages. We could not depart from this doctrine now without overruling all of the prior decisions of this court upon this subject, and we are not willing to do so.  *   *   * 'And after all this discussion the Supreme Court of the United States decides the law as laid down in these instructions. Mr. Justice Grier, delivering the opinion of the court, well says: "If repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument. By the common as well as by the statute law, men are often punished for aggravated misconduct or lawless acts, by means of a civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured." We have no doubt that such is the law. Whether it be founded in sound reason or not is not so much our province to say as to determine if it be law. The writer hereof believes it to be not only good law, but founded on sound principles, and beneficial in its application. It often furnishes the only restraint upon a bad man, who cares little for his neighbor's character, his person, or his property. The party injured pursues the wrongdoer to punishment when society is too careless to do so.' These decisions have since been followed in the cases of *Hefley* v. *Baker*, 19 Kan. 9; *Titus* v. *Corkins*, 21 Kan. 722; *Jockers* v. *Borgman*, 29 Kan. 109, 44 Am. Rep. 625; *Winstead* v. *Hulme*, 32 Kan. 568, 4 Pac. 994; *Railway Co.* v. *Rice*, 38 Kan. 403, 404, 16 Pac. 817, 5 Am. St. Rep. 706; *Clark* v. *Weir*, 37 Kan. 98, 14 Pac. 533; *West* v. *Telegraph Co.*, 39 Kan. 93, 17 Pac. 807, 7 Am. St. Rep. 530; *Manufacturing Co.* v. *Boyce*, 36 Kan. 351, 13 Pac. 609, 59 Am. Rep. 571."

Mr. Sedgwick, in his work on Damages (9th ed.), at sections 351 and 352, quotes the foregoing language of the Supreme Court of the United States, and from many decisions, showing that courts generally sustain the allowance of punitive damages. He says: "These authorities were followed by such a multitude of cases that the principle became, by the middle of the last century, as fully established by weight of authority as any doctrine

of the law. In the first edition of this treatise, the doctrine was recognized as so established; and this opinion, in the face of able and persistent opposition, has prevailed. * * * So in Connecticut, in an action on the case for gross negligence, it was held by Church, J., in delivering the opinion of the Supreme Court of Errors: 'There is no principle better established and no practice more universal than that *vindictive damages or smart money* may be and are awarded by the verdict of juries, and whether the form of the action be trespass or case.' So in Pennsylvania, Gibson, J., delivering the opinion of the court, said: 'In cases of personal injury, damages are given not to compensate but to punish.' "

At sections 365 and 366, over the citation of authorities, Mr. Sedgwick says: "Oppression, brutality, or insult in the infliction of a wrong is a cause for the allowance of exemplary damages. * * * A woman in delicate health is wrongfully turned out of her house at night in a storm; she may recover exemplary damages. A passenger, wrongfully ejected from a railroad train with rudeness and violence, may recover exemplary damages, though mere indecorous conduct in expelling a passenger is held not to be sufficient cause for their infliction. So exemplary damages may be recovered where the wrongful act is accompanied with circumstances of insult and outrage. * * * If the injury is wantonly inflicted, exemplary damages may be recovered; as, for instance, where the act was done with reckless disregard of the rights of others, or of the consequences of the act. Thus in *Baltimore and Yorktown Turnpike Road* v. *Boone,* where the company exacted illegal fare, and the plaintiff on his refusal to pay was forcibly ejected, it was held that he could recover exemplary damages on the ground that the company had been guilty of criminal indifference to the obligations of public duty, which amounted to malice; and so, generally, exemplary damages may be given against a carrier for ejection of a passenger in wanton disregard of his rights, or for deliberate refusal to stop a train on signal. Thus, also, exemplary damages

may be recovered for an unprovoked and causeless battery, and for reckless defamation."

Another eminent text-writer, Mr. Cooley, in volume 2 (3d ed.) of his work on Torts, page 1017, states: "The master is liable for the acts of his servant, not only when they are directed by him, but also when the scope of his employment or trust is such that he has been left at liberty to do, while pursuing or attempting to discharge it, the injurious act complained of. It is not merely for the wrongful acts he was directed to do, but the wrongful acts he was suffered to do, that the master must respond. * * * So when a railway company puts a conductor in charge of a train, and he purposely and wrongfully ejects a passenger from the cars, the railway company must bear the blame and pay the damages. In this case the company chooses its servant and puts him in charge of its business, and the injury is done while performing it, and in the exercise of the power conferred. If the corporate authorities did not direct the act to be done, they nevertheless put a person of their own selection in a position requiring the exercise of discretionary authority, and, by intrusting him with the authority and with the means of doing the injury, have, through his agency, caused it to be done. As between the company and the passenger, the right of the latter to compensation is unquestionable. So for an assault upon a passenger by the conductor, brakeman, or other employee. A railroad company is liable for the use of excessive force by its employees in ejecting a passenger from its cars. And generally the master is liable for the wilful or intentional wrongs of his servant committed in the performance of his duty as servant or within the scope of his employment.

In Hale on Damages (2d ed.) at page 326, it is said: "It is usually held that corporations are liable to exemplary damages for the acts of their agents or servants, in cases where the agent or servant would be liable for such damages. This is placed upon the ground that otherwise corporations would never be liable for exemplary damages,

since they can act only by agents or servants. Thus it has been said: 'We confess that it seems to us that there is no class of cases where the doctrine of exemplary damages can be more beneficially applied than to railroad corporations in their capacity of carriers of passengers, and it might as well not be applied to them at all as to limit its application to cases where the servant is directly or impliedly commanded by the corporation to maltreat and insult a passenger, or to cases where such act is directly or impliedly ratified; for no such cases will occur.' " And in the same work at page 381: "Where a carrier fails to carry a passenger to his destination, and sets him down at some intermediate point, compensation may be recovered for all the expenses of delay, including loss of time and cost of a reasonable conveyance to his destination. He may also recover compensation for the indignity of the expulsion from the train, and, if there are aggravating circumstances, he may recover exemplary damages. Where by the fault of the carrier's agents, and without the passenger's fault, the ticket is not such a one as he should have to entitle him to passage, the carrier will be liable in damages for expelling him."

In *Philadelphia and Reading R. R. Co.* v. *Derby*, 14 How. (55 U. S.) 468, 14 L. Ed. 502, the Supreme Court of the United States held that the master is liable for the tortious acts of his servant done in the course of his employment, even in disobedience of his master's orders. In *Railroad Co.* v. *Hanning*, 15 Wall. 657, 21 L. Ed. 220, that court said: "The rule extracted from the cases is this: The principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of. So long as he stands in the relation of principal or master to the wrongdoer, the owner is responsible for his acts. When he ceases to be such and the author is himself the principal and master, not a servant or agent, he alone is responsible."

In *Railroad Co.* v. *Quigley*, 21 How. (62 U. S.) 202, 222, 16 L. Ed. 73, it was held that a corporation was liable for

the acts of its agents, in contract or in tort, in the course of its business and of their employment, the same as an individual is responsible under similar circumstances.

It was held by the Supreme Court of the United States in *Day* v. *Woodworth,* 13 How. 363, 14 L. Ed. 181, that in an action for trespass and actions on the case the jury may give vindictive damages, and in support of this holding a number of cases are cited in the note at page 181, 14 L. Ed.

Apropos to the opposing views of counsel regarding the case of *Quigley* v. *C. P. R. R.*, 11 Nev. 350, 21 Am. Rep. 757, it is said, in section 359 of Sedgwick on Damages (9th ed.), that the doctrine of the Supreme Court of West Virginia that exemplary damages, so-called, are allowed, but are compensatory or undetermined damages, as the court calls them, appears to be the law in Nevada under the Quigley case. As Earle, J., did not participate in the decision in the Quigley case, any statements in the opinion of Hawley, C. J., and Beatty, J., in which both did not concur, are not binding as law because lacking the concurrence of a majority of the court. In that case a number of decisions are cited which sustain the award of exemplary damages, and no rule is promulgated different from the one generally approved by the courts, holding that in proper cases the party injured may recover exemplary, punitive or vindictive damages, which are usually considered the same. (*Hacket* v. *Smelsley,* 77 Ill. 109; *Roth* v. *Eppy,* 80 Ill. 283; *Giles* v. *Eagle Ins. Co.,* 2 Metc. 146; *Louisville & P. R. Co.* v. *Smith,* 2 Duv. 556; *Stoneseifer* v. *Sheble,* 31 Mo. 243; *Kennedy* v. *North Missouri R. Co.,* 36 Mo. 351; *Green* v. *Craig,* 47 Mo. 90; *Freese* v. *Tripp,* 70 Ill. 496; *Meidel* v. *Anthis,* 71 Ill. 241; *Freidenheit* v. *Edmundson,* 36 Mo. 226, 88 Am. Dec. 141; *McKeon* v. *Citizens' R. Co.,* 42 Mo. 79.)

10. In support of the contention of the appellant that if punitive damages are allowed at all, they cannot be imposed on the principal whether a natural person or a corporation, who did not either direct the wanton or oppressive conduct or afterwards ratify it, we are cited

to a number of cases, foremost of which is *Lake Shore Railway Co.* v. *Prentice*, 147 U. S. 101, 13 Sup. Ct. 261, 37 L. Ed. 97. In that case it was held that a railroad company was not liable for exemplary damages for the illegal and oppressive arrest of a passenger by the conductor of one of its trains, which it had in no way authorized or ratified. The present case is distinguishable because here the train agent, in taking up the ticket and ordering the removal of Forrester from the train, was acting within the line of the special authority which the company had given him to take up tickets and have passengers removed, while in the Prentice case the company had not authorized the conductor to have the passenger arrested.

If it were admitted for the purposes of this case that, as claimed, punitive damages cannot be recovered from a principal, whether a corporation or natural person, for the act of the agent when the principal did not direct or ratify the act, it is still apparent that the jury could allow punitive damages in this case, not only because the train agent was specially authorized, above the conductor, by the company, to confiscate tickets and have persons removed from the trains, and there is evidence from which the jury may have inferred that the train agent, in addition to having arrogantly insulted and humiliated Forrester and removed him from the car, was in the habit of ejecting people from the train, and that his conduct in this regard had been known and ratified by the company by keeping him in a position where he would continue to so treat passengers, but also by reason of the ratification by the company of the removal of Forrester from the train by continuing to refuse to give him transportation after notice to the district agent of the company of Forrester's removal from the train and request for transportation for him. By giving the train agent special authority to eject passengers and take up tickets, and allowing him extra compensation for invalid tickets taken up, and by refusing, after such notice and request for transportation, to give relief from his oppressive and wrongful acts in ejecting Forrester from the train, the company may be deemed to have ratified the act of their

agent so authorized and approved. The Supreme Court of the United States has often sustained the liberal award of damages for personal injuries caused by the acts of agents or servants acting within the scope of their employment, although the acts were not authorized or ratified.

In the case of *Singer Mfg. Co.* v. *Rahn*, 132 U. S. 518, 10 Sup. Ct. 175, 33 L. Ed. 440, a man was employed by a corporation under a written contract to sell sewing machines, with a provision that his services were to be paid for by commissions on sales and collections. It was held that he was a servant of the company, and that the company was responsible to third persons injured by his negligence in the course of his employment. A judgment was sustained against the company for $10,000 for personal injuries resulting from his careless driving of a horse and wagon.

In *New Jersey Steamboat Co.* v. *Brockett*, 121 U. S. 645, 7 Sup. Ct. 1041, 30 L. Ed. 1050, it is said in the opinion: "The plaintiff was entitled, by virtue of that contract, to protection against the misconduct or negligence of the carrier's servants. Their misconduct or negligence whilst transacting the company's business, and when acting within the general scope of their employment, is, of necessity, to be imputed to the corporation which constituted them agents for the performance of its contract with the passenger. Whether the act of the servant be one of omission or commission, whether negligent or fraudulent, 'if,' as was adjudged in *Phila. & R. R. R. Co.* v. *Derby* (55 U. S.) 14 How. 486, 14 L. Ed. 502, 'it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize or even know of the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable if the act be done in the course of his servant's employment.' See, also, *Phila. W. & Balt. R. R. Co.* v. *Quigley*, (62 U. S.) 21 How. 210, 16 L. Ed. 73. 'This rule,' the Court of Appeals of New York well says, 'is founded upon public policy and convenience. Every person is bound to use due care in the conduct of his business. If the business

is committed to an agent or servant, the obligation is not changed.' (*Higgins* v. *Watervliet Turnpike Co.*, 46 N. Y. 27, 7 Am. Rep. 293.) The principle is peculiarly applicable as between carriers and passengers; for, as held by the same court in *Stewart* v. *Brooklyn & C. R. R. Co.*, 90 N. Y. 591, 43 Am. Rep. 185, a common carrier is bound, as far as practicable, to protect its passengers, while being conveyed, from violence committed by strangers and copassengers, and undertakes absolutely to protect them against the misconduct of its own servants engaged in executing the contract."

11. Differently from the Prentice case, the decisions generally hold that the principal or master is liable in exemplary damages for the wrongful, wanton, and oppressive acts of the agent or servant when acting within the scope of his employment, although not authorized or ratified.

In *Rucker* v. *Smoke*, 37 S. C. 380, 16 S. E. 41, 34 Am. St. Rep. 760, the court said: "As we understand it, the proposition contended for by the counsel for appellant is that a principal cannot be held liable for exemplary damages on account of a wrongful, wanton, or malicious act done by his agent, within the scope of his agency, unless such act be previously authorized or subsequently ratified by the principal. We do not think that this proposition can be sustained either by reason or authority. When one person invests another with authority to act as his agent for a specified purpose, all of the acts done by the agent in pursuance or within the scope of his agency are, and should be, regarded as really the acts of the principal. If, therefore, the agent, in doing the act which he is deputed to do, does it in such a manner as would render him liable for exemplary damages, his principal is likewise liable, for the act is really done by him. * * * This view is, we think, fully sustained by authority. In Story on Agency, sec. 452, quoted with approval by Mr. Justice McGowan in *Reynolds* v. *Witte*, 13 S. C. 18, 36 Am. Rep. 678, we find the rule laid down as follows: 'It is a general doctrine of law that, although the principal is not ordinarily liable (for he

sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or cooperated in them, yet he is held liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, negligences, and other malfeasances, misfeasances, and omissions of duty of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies, *respondeat superior;* and it is founded on public policy and convenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of his agency. The rule is also well stated in 1 Am. & Eng. Ency. of Law, at page 410, in these words: "A principal is liable to third parties for whatever the agent does or says; whatever contracts, representations, or admissions he makes; whatever negligence he is guilty of; and whatever fraud or wrong he commits: provided, the agent acts within the scope of his apparent authority, and provided a liability would attach to the principal if he was in the place of the agent."' This rule has been repeatedly recognized or acted upon in this state, as shown by the following cases cited by respondent's counsel: *Parkerson* v. *Wightman,* 4 Strob. (S. C.) 363; *Redding* v. *South Carolina R. R. Co.,* 3 S. C. 1, 16 Am. Rep. 681; *Epstein* v. *Brown,* 21 S. C. 599; *Hall* v. *South Carolina Ry. Co.,* 28 S. C. 261, 5 S. E. 623; *Avinger* v. *South Carolina Ry. Co.,* 29 S. C. 271, 7 S. E. 493, 13 Am. St. Rep. 716; and *Quinn* v. *South Carolina Ry. Co.,* 29 S. C. 381, 7 S. E. 614, 1 L. R. A. 682."

A number of Illinois cases upholding this doctrine of liability are cited in the note in 34 Am. St. Rep. 761.

In *Calloway* v. *Millett,* 15 Ind. App. 366, 44 N. E. 198, 57 Am. St. Rep. 238, it was held that a person who pays

his fare and in good faith accepts a ticket from the ticket agent, who assures him that it will be good for passage, has a right to board a train as a passenger; and, if his ticket is rejected by reason of expired limitation, and he is ejected from the train for nonpayment of fare, he may recover exemplary damages. It is stated in the opinion: "It is true that in actions for breach of contract exemplary or punitive damages are allowable only where the act complained of has been committed wilfully and maliciously, or, in the absence of actual malice, where it has been committed under circumstances of violence, oppression, outrage, or wanton recklessness."

In *Southern Railway Co.* v. *Wooley*, 158 Ala. 447, 48 South. 369, in an action against a railway company for leaving a passenger at a station short of her destination, there was evidence justifying an inference that the railway company's flagman was guilty of wantonness in directing plaintiff to remove to the wrong car, and it was held that punitive damages could be recovered.

In *Company* v. *Lowry*, 79 Miss. 431, 30 South. 634, the conductor on signal failed to stop the streetcar until it had passed a brick crossing from twenty to forty feet, and refused to back the car, as there was a regulation of the company against backing cars. The conductor insulted and ridiculed the passenger upon his refusal to go through the mud to the car, and he had several blocks to walk. It was held that the jury in assessing damages were authorized to allow, not only just compensation for the injury, but to inflict a proper punishment for the company's disregard of public duty.

In *Harlan* v. *Wabash Ry. Co.*, 117 Mo. App. 537, 94 S. W. 737, the collector told a passenger to get off at a station before he reached his destination, and that the train would not stop at his destination. The collector refused to put the passenger off at his station, carried him to the next station, where he was detained for two or three hours, and he was carried back to his destination free of charge. It was held that he was entitled to exemplary damages.

In *Alabama R. R. Co.* v. *Sellers*, 93 Ala. 9, 9 South. 375, 30 Am. St. Rep. 16, the conductor, after having passed a station without allowing a passenger to alight, refused to return with the train to the station, and compelled the passenger to alight in a driving rain, two hundred yards from the railroad station, whereby she was exposed to the elements while she was walking that distance, to the injury of her health. It was held that exemplary damages might be awarded, although the actual injury suffered was nominal. It is said in the opinion: "If the jury believed the testimony we have detailed, they would have been justified in the conclusion that the defendant's conductor, within the range of his employment, wilfully refused to move the train back to the station and wilfully compelled the plaintiff to alight in a driving rain several hundred yards from any shelter, so encumbered with her child and baggage as to be unable to protect herself, and necessitating exposure to the elements while walking this distance. We cannot hesitate to affirm that this misconduct on the part of defendant's employee with knowledge of the situation, was such a wilful wrong, committed in such reckless disregard of the necessarily injurious consequences to the plaintiff, as authorized the jury to punish the defendant therefor by the imposition of exemplary damages. (*New Orleans R. R. Co.* v. *Hurst*, 36 Miss. 660, 668, 669, 74 Am. Dec. 785; *Wilkinson* v. *Searcy*, 76 Ala. 176; *Alabama R. R. Co.* v. *Frazier*, 93 Ala. 45, 9 South. 303, 30 Am. St. Rep. 28.) * * * Acts readily conceivable, which involve malice, wilfulness, or wanton reckless disregard of the rights of others, though not within the calendar of crimes, and inflicting no pecuniary loss or detriment measurable by a money standard on the individual, yet merit such punishment as the civil courts may inflict by the imposition of exemplary damages. And upon these considerations the law is, and has long been, settled in this state that the infliction of actual damage is not an essential predicate to the imposition of exemplary damages. (*Parker* v. *Mise*, 27 Ala. 480, 62 Am. Dec. 776; *Western*

*Union Tel. Co.* v. *Henderson,* 89 Ala. 510, 7 South. 419, 18 Am. St. Rep. 148; *Alabama R. R. Co.* v. *Heddleston,* 82 Ala. 218, 3 South. 53.) See, also, 1 Sutherland on Damages, 748."

In *Sommerfield* v. *Transit Co.,* 108 Mo. App. 718, 84 S. W. 172, a streetcar conductor refused to accept transfer checks, and demanded the payment of cash fare. Such payment being refused, he ejected the passengers from the car. It was held that the award of exemplary damages was proper. The court said: "The plaintiff was not confined in his recovery to actual damages; the law is firmly established that where the commission of a tort is attended with circumstances denoting malice, or oppression, or where the defendant acts wilfully and with wanton disregard of the rights of others, exemplary or punitive damages may be allowed, as well for the punishment of the wrong inflicted as to deter repeated perpetration of similar acts. (2 Sutherland, Damages, 3d ed. sec. 391.) The propriety of allowing juries to award such class of damages in cases of unlawful eviction from vehicles of common carriers of passengers has been sanctioned alike by this court and the supreme court. (*Hicks* v. *Railroad,* 68 Mo. 329; *Malecek* v. *Railroad,* 57 Mo. 17; *Evans* v. *Railroad,* 11 Mo. App. 463; *Kellett* v. *Railroad,* 22 Mo. App. 356.) The cases relied on by defendant are instances where the elements of oppression, insult, and abuse in aggravation of the wrong were wholly absent, and the agents enforcing eviction acted erroneously, but in good faith and without force or violence."

In *City Railway* v. *Brauss,* 70 Ga. 368, the plaintiff and his wife entered a streetcar, gave tickets to the conductor, and told him where they wished to go. He had them transferred to another car, but gave them no transfer checks. The conductor of the latter car removed them a short distance from a corner, and they had to walk in the mud and in the presence of a number of people. The court said: "We think, as we have before shown, that this is an action *ex delicto,* founded upon the failure of the defendant to perform a duty imposed by its contract, and that the plaintiff was entitled to recover

damages in consequence of this breach of duty, and that the motion was properly overruled. * * * The circumstances under which he was put off, and the place where he and his wife were landed, were well calculated to wound the feelings and mortify the pride of any man of ordinary sensibility."

In *Louisville Ry. Co.* v. *Fowler* (Ky.) 107 S. W. 703, it was held that a railroad company had the right to eject a passenger who did not present a ticket or pay fare, but it was liable for punitive damages for injuries resulting from expelling a person from the train, and for insult and indignity offered by the conductor.

In *Illinois Cent. Ry. Co.* v. *Reid*, 93 Miss. 458, 46 South. 146, 17 L. R. A. n.s. 344, a passenger recovered punitive damages for ejection from a railway train at the last stop before his destination, which was not a regular station. He had made a special contract with the carrier's agent to have his train stop at his destination, but the last conductor threw the tickets in the passenger's lap, telling him he must alight, and refusing to listen to any explanation, saying, "I have heard that before."

In *Kibler* v. *Southern Railway*, 64 S. C. 242, 41 S. E. 977, a judgment awarding punitive damages for refusing plaintiff passage on a train on tender of fare was affirmed. The court said: "When the conductor of a train wilfully, wrongfully, unlawfully, and intentionally refuses a citizen passage thereon after he has offered to pay the legal fare for such passage, and actually causes him to leave the train before arriving at his destination, a cause of action for punitive damages exists. * * * The evidence tended to show that the citizen who tendered the legal fare was ordered from the train, and that there were other passengers on board to witness the plaintiff's humiliation, when required to leave the train. This testimony was before the jury. * * * It was for the jury to weigh it to see if there was malice, fraud, wantonness, etc. The circuit judge committed no error, as here pointed out. * * * It is quite true that punitive damages do not result from ordinary negligence. Nevertheless, such damages do arise from wantonness,

oppression, or rude and insulting conduct of a conductor to a passenger. It was the duty of the jury, and not the circuit judge, to determine if the testimony offered by plaintiff established such a delict in the conductor toward this passenger."

In *Kansas, Fort Scott and Memphis R. R. Co.* v. *Little*, 66 Kan. 378, 71 Pac. 820, 61 L. R. A. 122, 97 Am. St. Rep. 376, it was held that a passenger has the right to rely upon the representations of the local ticket agent that the train will stop at a point to which he has purchased a ticket, and that the company is liable if he is compelled to leave the train before arriving at his destination, because by the general rules of the company, unknown to the passenger, such train is not scheduled to stop at that station. It was held that exemplary damages may be allowed where a wrong has in it the elements of negligence which is gross or wanton or wilfully oppressive, and that an indignity need not be done to one in the presence of a number of people in order to entitle the person wronged to recover damages for the humiliation and disgrace suffered.

A passenger wrongfully ejected from a train may recover damages without direct proof of the shame and humiliation suffered by him. (*Chicago R. R. Co.* v. *Chisholm*, 79 Ill. 584.)

In *Dixon* v. *Northern Pac. Ry. Co.*, 37 Wash. 310, 79 Pac. 943, 68 L. R. A. 895, 107 Am. St. Rep. 810, 2 Ann. Cas. 620, it was held that it is *prima facie* within the implied authority of the brakeman of a railroad train to eject trespassers, and that if in removing them he does not exercise care and caution, but acts wantonly or maliciously, the railroad company will be liable for resulting injury. A number of cases pertaining to this question were considered, and the court said: "But, notwithstanding this distinction, the law, out of regard for common humanity, will not permit a master to allow his servant to unnecessarily abuse or imperil the life or limb even of a trespasser, and, if the company, through its servants, wilfully injure him, it will be liable, even

though he may have been guilty of contributory negligence. It is well settled, generally, that a railroad company is responsible in damages to a trespasser for torts committed upon him by a servant who, in the commission of the tort, is acting within the line of his employment, and within the scope of his authority—not within the scope of his authority as applied to the commission of the tort, for no authority for such commission could be conferred, but within the scope of his authority to rightfully do the particular thing which he did do in a wrongful manner. And, while the master will not be liable for the wilful act of the servant not done to further or protect the master's interest, or with a view to the master's service, if the servant is authorized to perform the duty, but in the performance of that duty acts wilfully or negligently to the detriment of another, the master will be held liable. So that the pertinent question in this case is: Was the brakeman acting within the actual or implied scope of his employment when he committed the act complained of? * * * It may be that these powers have increased with the changing conditions incident to railroading, and that the observation of this increase in his powers is the cause of the change in judicial decision on this question; for it is noticeable that most of the cases holding to the theory that the brakeman is not acting within the scope of his authority or employment, when ejecting a trespasser from the train, were decided many years ago, while the great majority of the cases holding to the other doctrine are of modern announcement. While this authority, of which we have been speaking, may not be strictly conferred upon the brakeman by the terms of the employment contract, we think that it must be a matter of common observation that such authority is an inference from the nature of the business, and its actual daily exercise."

In *Lindsay* v. *Oregon S. L. R. Co.*, 13 Idaho, 483, 90 Pac. 985, 12 L. R. A. n.s. 187, the court said: "It is contended by counsel for the appellant that the brakeman had no authority to expel a passenger, and for that reason was

acting outside of his authority if he had expelled him, and the company would not be liable therefor. There is nothing in this contention, for the correct doctrine on this point is laid down in 3 Thomp. Neg. sec. 3176; Patterson, Railway Acci. Law, sec. 111; 6 Cyc. Law and Prac. p. 561. As stated in the last-cited authority, it is the duty of the carrier to afford protection for its passengers, and if it has in its employ a brakeman who ejected a passenger from a train who was entitled to ride, the company is certainly liable."

The Supreme Court of Georgia, in *Seaboard Air Line Ry. Co.* v. *O'Quin*, 124 Ga. 357, 52 S. E. 427, 2 L. R. A. n.s. 472, held that punitive damages were recoverable by a passenger who was expelled from the train by the conductor or other employees in charge, and that when the company undertakes to eject a passenger guilty of disorderly conduct, it acts at its peril in determining his identity; and if by mistake the wrong passenger is ejected, the carrier will be liable to respond in damages for the acts committed by its servants, their good faith being available only in defeating a recovery of punitive damages. The court approved the instruction that: "In every tort there may be aggravating circumstances, either in the act or in the intention; and in that event the jury may give additional damages, either to deter the wrongdoer from repeating the trespass, or as a compensation for the wounded feelings of the plaintiff."

In *Louisville and Nashville R. R. Co.* v. *Garrett*, 8 Lea (Tenn.) 438, 41 Am. Rep. 640, it was held that a passenger who ignorantly and in good faith tenders a tax certificate for his fare may not be ejected as a trespasser; and if before he is removed from the train another person offers to pay his fare for him, the carrier must receive it and carry him, or be liable for punitive damages.

In *Southern Light and Traction Co.* v. *Compton*, 86 Miss. 629, 38 South. 629, it was held that punitive damages were properly awarded to a woman who was rudely ejected from a streetcar by the conductor, and compelled to

walk some distance in the mud, because of her refusal to comply with the demand of the conductor that she change her seat in the car.

In *Louisville R. R. Co.* v. *Ballard,* 88 Ky. 139, 10 S.W. 429, 2 L. R. A. 694, an action to recover for being taken past a station to which the passenger purchased a ticket, it was held proper to give an instruction that if any of the employees of the company were insulting in words, tone, or manner, the jury should find for the plaintiff damages in their discretion, not exceeding the amount claimed.

In *Yazoo R. R.* v. *Fitzgerald,* 96 Miss. 197, 50 South. 631, and *Cinn. Ry. Co.* v. *Strosnider* (Ky.) 121 S.W. 971, it was held that insulting and oppressive conduct toward a passenger, without expulsion, will warrant the recovery of punitive damages.

Where the original purchaser of a ticket was ejected by the conductor because the selling agent had erroneously punched the ticket for a female instead of for a male, and the conductor said it was a "bogus ticket," and ejected the passenger from the train without giving him an opportunity for an explanation, it was held that a recovery of both actual and exemplary damages was warranted. (*Illinois Central Ry. Co.* v. *Gortikov,* 90 Miss. 787, 45 South. 363, 14 L. R. A. n.s. 464, 122 Am. St. Rep. 324.) The court said: "Whether the ticket was in fact or not, when bought, punched in the wrong place, so as to show that it was issued to a female, is in our view wholly immaterial. That was a matter for the convenience of the railroad company, and no passenger should be held to be bound by the mistakes of the agent in using his punch. * * * According to the testimony of the plaintiff there was no talk from the conductor on the subject of an erasure or change in the name until the trial of the cause. * * * This ticket shows that it was bought October 27, 1904, and that the return limit was punched so as to show December 14, although that very ticket provides, as all such did, that it is good for ninety days from its date, to be not later than December

31, 1904. This is conclusive of the contract, regardless of the mistake which the agent says he made in punching the ticket, and was a matter for explanation, to say the least of it, if the conductor had made the point or been willing to accept explanation. In any case it is the duty of the conductor, when doubt arises as to a ticket, whether a general ticket or a special touring ticket with reduced rates, to listen to and accept any reasonable explanation offered, or take the chances. (*Railroad Co.* v. *Harper*, 83 Miss. 560, 35 South. 764, 64 L. R. A. 283, 102 Am. St. Rep. 469; *Railroad Co.* v. *Holmes*, 75 Miss. 371, 23 South. 187; *Railroad Co.* v. *Riley*, 68 Miss. 765, 9 South. 443, 13 L. R. A. 38, 24 Am. St. Rep. 309; *Railroad Co.* v. *Drummond*, 73 Miss. 813, 20 South. 7—cited by counsel for appellee.) This court is in line with those cases holding that a passenger is not required to see that the selling agent of the ticket made the proper punch marks. The fact that the passenger did not do so does not destroy the validity of the contract. (*Railroad Co.* v. *Holmes*, 75 Miss. 371, 20 South. 187.) In the case at bar it was clearly the conductor's duty to accept the explanation, regardless of the punch marks. But, as we have said, the evidence on the part of the plaintiff is that the conductor made no such objection to the ticket, but put his refusal explicitly on the ground that the ticket had been issued to a female, and was a 'bogus ticket.' Looking to all that appears on this ticket, the expulsion was unnecessary, and from the circumstances shown on the part of the plaintiff it is our opinion that they warranted the recovery of both actual and exemplary damages. Examining the whole ticket, it is clear that the contract was not to expire until December 31, and, if the punch mark contradicted this, it should not have been considered by the conductor, because the printed contract should be taken most strongly against the railroad company which issued it."

In *Louisville & N. R. R. Co.* v. *Hine*, 121 Ala. 234, 25 South. 857, it was held that for an injury caused by a breach of duty which a common carrier owes to its passengers an action lies in tort, as well as on the contract

of carriage, and humiliation and indignity are elements of actual damage. The court said: "The carrier cannot shield himself from the consequences of misconduct or mistake on the part of one of its agents acting within the scope of his duties, which has naturally betrayed another of its agents into the final act of injury to the passenger. (*Murdock* v. *Boston and Albany R. Co.*, 137 Mass. 293, 50 Am. Rep. 307; *Lake Erie & W. R. R. Co.* v. *Fix*, 88 Ind. 381, 45 Am. Rep. 464; *Hufford* v. *Grand Rapids and Ind. R. Co.*, 64 Mich. 631, 31 N. W. 544, 8 Am. St. Rep. 859; *Head* v. *Ga. Pac. R. Co.*, 79 Ga. 358, 7 S. E. 217, 11 Am. St. Rep. 434; *L. & N. R. R. Co.* v. *Gaines*, 99 Ky. 411, 36 S. W. 174, 59 Am. St. Rep. 465.)  *  *  *  The issue being found in favor of the plaintiff, he was entitled to recover the damages proximately resulting to him from the wrong, including the expense and inconvenience to which he was put. Humiliation and indignation, if suffered by him from the ejection, are also elements of actual damages. Such damages may arise from a sense of injury and outraged rights engendered by the ejection alone, without regard to the manner in which it was effected, and though done only through mistake. (*Head* v. *Ga. Pac. R. Co.*, *supra*; *Chicago and Alton R. Co.* v. *Flagg*, 43 Ill. 364, 92 Am. Dec. 133; *Phila. R. Co.* v. *Hoeflich*, 62 Md. 300, 50 Am. Rep. 223; *Smith* v. *Pittsburg R. Co.*, 23 Ohio St. 10.)"

If a passenger have a misunderstanding and contention with the conductor, and is ordered to leave the train, he is under no duty to remain on the train until expelled by force, and if he refuses when commanded he is coerced. (*Georgia R. R. Co.* v. *Eskew*, 86 Ga. 641, 12 S. E. 1061, 22 Am. St. Rep. 490; *Atchison T. & Santa Fe R. Co.* v. *Gants*, 38 Kan. 608, 17 Pac. 54, 5 Am. St. Rep. 780.)

12. The amount awarded by the jury is large, and we have considered carefully whether it ought to be set aside or reduced. In actions for damages in which the law provides no legal rule of measurement it is the special province of the jury to determine the amount that ought to be allowed, and the court is not justified in reversing the case or granting a new trial on the ground

that the verdict is excessive, unless it is so flagrantly improper as to indicate passion, prejudice, or corruption in the jury.

In *Solen* v. *V. & T. R. R. Co.*, 13 Nev. 138, it is said: "There being no absolute, fixed, legal rule of compensation, appellate courts ought not to interfere with the verdict unless it clearly appears that there has been such a mistake of the principles upon which the damages were estimated, or some improper motive or bias indicating passion or prejudice on the part of the jury. (*Worster* v. *Proprietors of Canal Bridge*, 16 Pick. 547; *Boyce* v. *Cal. Stage Co.*, 25 Cal. 461; *Schmidt* v. *M. & St. P. R. Co.*, 23 Wis. 192, 99 Am. Dec. 158; *Klein* v. *Jewett*, 26 N. J. Eq. 480; *Penn. R. Co.* v. *Allen*, 53 Pa. 276; Sedgwick on Measure of Damages, 601, 602, and authorities there cited.) The amount of the verdict—although perhaps greater than we would have given—is not, in our opinion, inconsistent with the exercise of an honest judgment upon the part of the jury, whose special province it was to determine this question." This language was quoted with approval, and numerous other causes cited following the rule, in *Burch* v. *Southern Pacific Co.*, 32 Nev. 106, Ann. Cas. 1912b, 1166; *Wedekind* v. *So. Pac. Co.*, 20 Nev. 301, and *Engler* v. *W. U. T. Co.*, 69 Fed. 188.

In *Cleveland, Cinn., O. & St. L. Ry. Co.* v. *Hadley*, 170 Ind. 204, 82 N. E. 1025, 84 N. E. 13, 16 L. R. A. n.s. 527, 16 Ann. Cas. 1, the Supreme Court of Indiana sustained a judgment for $10,000 for an injury to the elbow joint, caused by the falling of a window sash, affecting chiefly the ulnar nerve, resulting in a numb feeling in the arm and the little and ring fingers, and shrunken condition of the muscles of the arm, and loss of grip. The court said: "The general principle is well established that this court will not reverse the judgment of the court below in refusing to grant a new trial on the ground of excessive damages, unless, at first blush, the damages assessed appear to be outrageous and excessive, or it is apparent that some improper element was taken into account by the jury in determining the amount. (*Michigan City* v. *Phillips*, 163 Ind. 449, 71 N. E. 205; *Indianapolis St. R. Co.* v.

*Schmidt,* 163 Ind. 360, 71 N. E. 201; *Illinois Cent. R. Co.*
v. *Cheek,* 152 Ind. 663, 53 N. E. 641; *Ohio R. Co.* v. *Judy,*
120 Ind. 397, 22 N. E. 252; *Louisville R. Co.* v. *Miller,* 141
Ind. 533, 37 N. E. 343; *Evansville R. Co.* v. *Talbot,* 131 Ind.
221, 29 N. E. 1134; *Carthage Turnpike Co.* v. *Andrews,*
102 Ind. 138, 1 N. E. 364, 52 Am. Rep. 653; *Farman* v.
*Lauman,* 73 Ind. 568; *Westerville* v. *Freeman,* 66 Ind. 255;
*Yater* v. *Mullen,* 23 Ind. 562; *Picquet* v. *McKay,* 2 Blackf.
465.) The determination of the extent of the injury com-
plained of, and the proper compensation therefor, were
peculiarly within the province and power of the trial jury,
and when its judgment has been fairly obtained and, in
the light of all the incidents of the trial, confirmed by the
presiding judge, an abuse of this right and power must
be clearly manifest to warrant an appellate court in
disturbing the judgment on the ground of excessive
damages. (*Hudelson* v. *Hudelson,* 164 Ind. 694, 74 N. E.
504; *Creamery Package Mfg. Co.* v. *Hotsenpiller,* 159 Ind.
99, 64 N. E. 600; *Mead* v. *Burk,* 156 Ind. 577, 60 N. E. 338;
*Lee* v. *State,* 156 Ind. 541, 60 N. E. 299.)"

13. If the case did not present so many unusual and
serious circumstances of oppression, hardship, and injury,
we would feel less inclined to allow the verdict to stand.
To insult and humiliate a passenger who is ill and travel-
ing on a ticket he has regularly purchased, search his
baggage, take up his ticket when knowing that he is
without means to again pay for his passage, eject him
from the train at a station which is little more than a
sidetrack, several hundreds of miles from his destina-
tion and friends, leaving him to beg for assistance, and
make his way while ill by walking or riding in exposed
positions on coal cars or freight trains, is a serious
matter, and a verdict for a liberal amount, which will
tend to stop such treatment of passengers by public
carriers, is justifiable. From the testimony that the
train agent gloated over putting off other passengers,
and the fact that the company paid him an extra amount
for each ticket he took up as invalid, the jury may have
inferred that such was the habit of the company. If
there were others ejected, who were able to pay fare for

traveling on the next train in a few hours, they may have suffered little damage to warrant the institution of a suit and prolonged litigation with the company, or may have been unable to employ counsel.

It may be doubted whether, for the amount of the verdict, if considered as covering actual damage, the officers and stockholders of the company would want to undergo all that the evidence on the part of the plaintiff indicates Forrester was made to endure by reason of the acts of the train agent; the insult, searching of baggage, accusation that he had stolen the ticket, ejection from the train in the presence of other passengers, the later insulting refusal of the district agent to give transportation when solicited, the humiliation of seeking assistance, the pain and suffering of body and mind in traveling hundreds of miles on engines and coal cars during inclement weather while ailing, the taking of pneumonia, the suffering from it in the hospital, the incapacity for work, and the evident shortening of life. In view of all these circumstances, and compared with the amounts allowed by juries and sustained by courts in other cases not nearly so serious, in which insult, humiliation and illness were elements of damage, we are unable to say that the jury acted upon prejudice or passion, or that the verdict ought to be set aside. In comparison with the circumstances, injury inflicted and consequences, verdicts as liberal have been upheld as meeting the actual damage sustained, and without consideration of the right to award exemplary damages. The amount allowed for personal injuries in different cases has varied greatly, according to the circumstances and the determination of the jury. Seldom has a case come before the courts regarding the expulsion of a passenger in which the conditions were so aggravated and the consequences so serious. The charges of theft and different insults heaped upon Forrester, according to the testimony, his submissive conduct and earnest attempts to identify himself and show his right to remain upon the train, the humiliating denial of his request for transportation after his expulsion from the

train, coupled with the charge that he or his case was bogus, and more especially the long distance from his destination when he was ill and without means to buy another ticket, and the resulting privation, hardship, suffering, disease, and shortening of life justify the award of a much larger amount as damage than in ordinary cases where the most injurious of these conditions are lacking. Verdicts for about half the amount of the one in this case have been held not excessive when the aggravation and injury were not half so great.

The Supreme Court of Mississippi, in *Railroad Co. v. Hurst*, 36 Miss. 660, 74 Am. Dec. 785, said: "It is always matter of grave consideration with courts of the last resort to disturb the verdict of a jury fairly rendered, upon the evidence before them, and more especially when sanctioned by the direct judgment of the court before whom it was rendered, on a motion for a new trial. But, in cases of this character, when the application is based solely on the ground of excessive damages, to warrant the interposition of this court, the verdict must be so flagrantly improper as to evince passion, prejudice, or corruption in the jury. In personal torts, the courts will look narrowly into the circumstances, as they very rarely grant a new trial for excessive damages. (3 Graham & Waterman on New Trials, 1131, and cases cited.) It is an authority to be exercised with great caution and discretion. It is the peculiar province of a jury to assess damages, and when, as in actions sounding damages merely, the law furnishes no legal rule of measurement save their discretion, under the evidence before them, it is very rare indeed that a court will feel itself justified in setting aside a verdict merely for excess. It is not enough that, in the opinion of the court, the damages are too high. It may not rightfully substitute its own sense of what would be a reasonable compensation for the injury for that of the jury. The jury are allowed, and indeed it is their duty in all such cases where the law provides no other penalty, to consider the interests of society, as well as justice to the plaintiffs, and by their verdict, while they make just compensation

for the private injury, also to inflict proper punishment for the disregard of public duty. (*Cook* v. *Hill*, 3 Sandf. 341; *Collins* v. *Albany & S. R. R. Co.*, 12 Barb. 492; *Schlencker* v. *Risley*, 3 Scam. 483, 38 Am. Dec. 100; *Vreeland* v. *Berry*, 21 N. J. Law, 183; *Thompson* v. *Morris Canal and Banking Co.*, 17 N. J. Law, 480; *Bodwell* v. *Osgood*, 3 Pick. 379, 15 Am. Dec. 228; *McNamara* v. *King*, 2 Gilman, 432; *Johnson* v. *Moulton*, 1 Scam. 532; *Vanzant* v. *Jones*, 3 Dana, 464; *Worford* v. *Isbel*, 1 Bibb, 247, 4 Am. Dec. 633; *North* v. *Cates*, 2 Bibb, 591; *Roberts* v. *Swift*, 1 Yeates, 209, 1 Am. Dec. 295; *Taylor* v. *Giger*, Hardin, 586: *Deacon* v. *Allen*, 4 N. J. Law, 338; *Vanch* v. *Hall*, 3 N. J. Law, 814; *Webber* v. *Kenny*, 1 A. K. Marsh. 345; *Respass* v. *Palmer*, 2 A. K. Marsh. 365; *Allen* v. *Craig*, 13 N. J. Law, 294; *Tillotson* v. *Cheetham*, 2 Johns. 74, 3 Johns. 56, 3 Am. Dec. 459; *Whipple* v. *Cumberland Mfg. Co.*, 2 Story, 661, Fed. Cas. No. 17,516; *Coleman* v. *Southwick*, 9 Johns. 45, 6 Am. Dec. 253; *Southwick* v. *Stevens*, 10 Johns. 443.) The law has not intrusted the court with the discretion to estimate damages, but has devolved the power on a jury, as a matter of sentiment and feeling, to be exercised by them according to their sound discretion, duly weighing all the circumstances of the case. * * * Judges, therefore, should be very careful how they overthrow verdicts, given by twelve men, on their oaths, on the ground of excessive damages. (Per Parsons, C. J., in *Coffin* v. *Coffin*, 4 Mass. 1, 3 Am. Dec. 189; *Simpson* v. *Pittman*, 13 Ohio, 365; *Fisher* v. *Patterson*, 14 Ohio, 418; *Clark* v. *Pendleton*, 20 Conn. 495; Sedgwick on Damages, 39, *et seq.*, and authorities cited.) The cases, both English and American, while fully admitting the power and discretion of the court, uniformly concur in the doctrines above laid down."

In an English case the jury gave £500 damages for merely knocking a man's hat off, and the court refused a new trial. (*Merest* v. *Harvey*, 5 Taunt. 442.)

In *Dagnall* v. *Southern Ry. Co.*, 69 S. C. 110, 48 S. E. 97, the plaintiff paid full fare for a ticket which he did not know was limited by the punch marks, and was expelled from the train when using the ticket after the limitation. It was held that he was entitled to passage,

as he had paid full fare, notwithstanding the limitation on the ticket, and that as his expulsion was wanton and wilful on the part of the defendant's employees, he was entitled to recover punitive damages, and a judgment for $1,200 was sustained.

In *White* v. *Metropolitan St. Ry. Co.*, 132 Mo. App. 339, 112 S. W. 278, defendant street railway company's conductor wrongfully refused to accept a transfer, the plaintiff refused to pay his fare, and the conductor seized him and pulled him off the car, saying that he could not return without paying the fare, and thereupon the plaintiff paid the fare and returned to the car, but the conductor continued to treat him in an insolent manner. It was held that whether the conductor was insulting and abusive in his language and demeanor and acted with malice was a question for the jury and that a verdict for $250 punitive damages was not excessive.

In *Cagney* v. *Manhattan Ry. Co.* (City Ct. N. Y.) 2 N. Y. Supp. 402, plaintiff purchased a ticket for a ride on the elevated railroad, and deposited it in the canceling box without the knowledge of the gateman, who refused to allow him to board the train, although the ticket agent, who was superior in authority, said he had sold the plaintiff the ticket and told the gateman to let him ride. There were many people, and plaintiff was apparently mortified at the imputation of attempting to ride without payment. Unable to secure a train without buying another ticket, plaintiff walked home. It was held that the defendant was liable for the malicious act of its agent, the gateman, within the line of his duty, and that both actual and exemplary damages were recoverable. A verdict for $500 was sustained as not excessive.

In *Rand* v. *Butte Electric Ry. Co.*, 40 Mont. 398, 107 Pac. 88, the employees of a streetcar company seized, beat, and roughly handled the plaintiff, so that his head and face were badly cut, his nose broken, and he was confined to his bed under the care of a physician for several weeks. In favor of the company it was claimed that he was drunk and disorderly, and that the assault resulted from an attempt to put him on the streetcar and send

him away from the ball grounds back to Butte City, a distance of two miles. A verdict of $2,500 was sustained.

In *Little Rock Ry. & E. Co.* v. *Dobbins*, 78 Ark. 553, 95 S. W. 788, an award of $500 compensatory damages and $250 exemplary damages for the ejection of a passenger from a streetcar with insulting language by the conductor, and for causing the passenger's arrest for alleged disorderly conduct, was sustained.

In *Craker* v. *Chicago & N. W. Ry. Co.*, 36 Wis. 657, 17 Am. Rep. 504, the conductor kissed a female passenger, and for his conduct was promptly dismissed from the service of the railroad. A verdict against the company for $1,000 was sustained. In the opinion it is said: "She was entitled to liberal damages for her terror and anxiety, her outraged feeling and insulted virtue, for all her mental humiliation and suffering. We cannot say that the damages are excessive. We might have been better satisfied with a verdict for less. But it is not for us, it was for the jury, to fix the amount. And they are not so large that we can say that they are unreasonable. Who can be found to say that such an amount would be in excess of compensation to his own or his neighbor's wife or sister or daughter? (*Hewlett* v. *Crutchley*, 5 Taunt. 276.) We cannot say that it is to the respondent. * * * The judgment of the court below is affirmed."

In *Railway Co.* v. *Mynott*, 83 Ark. 6, 102 S. W. 380, a passenger was beaten by trainmen, insulted by profane and abusive language, expelled from the train with humiliation before reaching his destination, and compelled to make his way home in the night. On the part of the company it was claimed that he was drunk. A verdict for $1,500 was held not excessive.

In *Louisville & N. Ry. Co.* v. *Cottongim* (Ky.) 119 S. W. 751, a passenger after tendering his fare was wrongfully and roughly ejected from the train, and was thrown against the ground so hard that his leg was badly bruised and swollen, and he was compelled to walk while so injured a mile and a half to the next town. The court authorized punitive damages, and it was held that a verdict for $2,500 was not excessive.

In the case of *Morrison* v. *The John L. Stevens*, 17 Fed. Cas. 838, the libelant Morrison paid for passage and the exclusive use of a stateroom for himself and his wife, who was an invalid, from New York to San Francisco. Relying on the waybill, which was different from the ticket Morrison had secured, the agent at Panama attempted to place a male passenger in the stateroom with Morrison and his wife. Morrison objected, and pleaded for the exclusive use of the room for himself and wife, but she was given a berth in a stateroom with two other females from Panama to San Francisco, and he was deprived of having the exclusive company of his wife. Damages in the amount of $2,500 were awarded.

In *New Jersey Steamboat Co.* v. *Brockett*, 121 U. S. 637, 7 Sup. Ct. 1039, 30 L. Ed. 1049, Brockett was a deck passenger on the boat from Albany to New York City, and went to sleep on a bale of hops on a part of the boat on which passengers were not allowed. He was assaulted by the watchman, caught by the collar of his coat, and pulled headlong from the freight, and his shoulder struck a barrel standing near and was dislocated. A verdict for $5,500 as compensatory damages was sustained.

In *Union Mill Co.* v. *Prenzler*, 100 Iowa, 540, 69 N. W. 876, it was held, under a statute providing for the survival of actions, that the death of the party injured, pending suit brought by him for wrongful attachment, and the substitution of his administrator, will not prevent the recovery of exemplary damages which might have been recovered by the decedent himself. A verdict for $770 actual damages and $5,000 exemplary damages for wrongful attachment of the property of a debtor who was seriously ill, and the allowance of $1,200 as attorney's fees, was sustained in favor of the administrator. It is said in the opinion: "When the action is brought by the representative of one deceased, it is to right the wrong done to his estate, and to take from the defendant that which will make the estate whole. But when the action, as in this case, is brought by the person injured, who dies during the pendency of the action, the law attempts to remedy the wrong done to him, and not necessarily

to his estate; and the damages in such case are not only compensatory, but may include exemplary as well. * * * The third objection to the allowance of exemplary damages is that they are and were excessive, and out of all comparison with the actual damages assessed. Now, while they are, no doubt, large, yet, as the matter of allowing such damages and the amount thereof rests peculiarly with the jury, we do not think we ought to interfere, except in extreme cases."

In *Chicago R. Co.* v. *Mochell*, 193 Ill. 208, 61 N. E. 1028, 86 Am. St. Rep. 318, a verdict for $15,000 for injuries, which did not appear to be permanent, to a stenographer, causing nervous prostration and organic disturbance of the valves of the heart, was reduced to $10,000.

In actions by the husband for damages for injuries making the wife an invalid, verdicts were upheld for $10,000 in *Cannon* v. *Brooklyn City R. Co.*, 14 Misc. Rep. 400, 35 N.Y. Supp. 1039, and for $12,000 in *Gulf Ry. Co.* v. *Higby* (Tex. Civ. App.) 26 S.W. 737.

For injuries to the nervous system weakening the heart, verdicts for $10,000 have been sustained in *Galveston R. Co.* v. *Worth*, 53 Tex. Civ. App. 351, 116 S. W. 365, and *Galloway* v. *Chicago R. Co.*, 56 Minn. 346, 57 N. W. 1058, 33 L. R. A. 442, 45 Am. St. Rep. 468.

In *Galveston R. Co.* v. *Vollrath*, 40 Tex. Civ. App. 46, 89 S. W. 279, a woman was made a nervous wreck, and to suffer with insomnia, pleurisy, and neuralgia, and a verdict for $14,000 in her favor was upheld.

In the extended note in 16 Ann. Cas., page 8, there is a classification of many actions for damages with reference to the amounts allowed.

In the federal court for the district of Nevada, in *Brown* v. *Evans* (C. C.) 17 Fed. 912, it was held that in actions where fraud, malice, cruelty, oppression, or wantonness is shown, exemplary damages may be recovered, and that in this class of action evidence may be given of defendant's wealth, and the verdict for $8,000 for a brutal assault and battery was sustained.

The same court in *Engler* v. *W. U. T. Co.* (C. C.) 69 Fed. 185, sustained a verdict for $15,000 for a serious

compound comminuted fracture of the bones of an ankle.

In *Schafer* v. *Gilmer & Salisbury*, 13 Nev. 330, the plaintiff claimed that pneumonia resulted from the upsetting of the stagecoach on which he was riding, and that the disease of his lungs had become incurable. It was held to be the duty of the jury to determine the nature and extent of the injury received by the person injured as a passenger, and a verdict for $5,000 was sustained.

Among the damage cases in this court verdicts have been sustained for liberal amounts. In *Wedekind* v. *S. P. Co.*, 20 Nev. 292, there was an award of $7,500 for a rupture received from a slight jolt of a car, which threw the plaintiff against the seat.

In *Powell* v. *N. C. O. Ry.*, 28 Nev. 40, $6,000 was recovered for an injury resulting from a fall which caused concussion of the brain and atrophic condition of the muscles of the right arm.

In *Murphy* v. *S. P. Co.*, 31 Nev. 120, 21 Ann. Cas. 502, a passenger had his leg injured in a collision by being thrown against the seat in front of him. The evidence was conflicting as to whether varicose veins resulted from the injury, or from his failure to take proper care of the injury. The court refused to set aside the verdict for $7,500.

In *Burch* v. *S. P. Co.*, 32 Nev. 75, Ann. Cas. 1912B, 1166, the plaintiff, while employed by the company, was struck by a switch and run over by the cars, necessitating amputation of the left leg three inches above the knee, and three toes of the right foot. A verdict for $18,000 was sustained in the federal court, and one for $20,000 rendered on the trial in the state district court after the remanding of the case from the federal court was sustained by this court.

In *Sherman* v. *S. P. Co.*, 33 Nev. 385, the amount awarded was $15,000 for injuries which crippled Sherman for life, and for suffering in a temperature twenty degrees below zero at the time of the derailment of the train.

In *Cutler* v. *Pittsburg Silver Peak M. Co.*, 34 Nev. 45, the plaintiff, an employee of the company, suffered the loss of one finger, burns about the hands and shoulder,

by coming in contact with an electric wire negligently maintained. His fingers and arms and shoulder were partially stiffened, but the arm and shoulder were not shown to be permanently injured. It was held that a verdict for $15,000 should be reduced to $7,500.

14. It is urged that certain statements made by the train agent and the conductor at the time Forrester's ticket was taken up and he was ejected from the train should have been excluded as hearsay testimony. The language asserted to have been used by the train agent that "we put them off here, and they sleep in boxcars," is an illustration of these statements. It is said that he had no authority to make such remarks, that an admission by an agent is not receivable against his principal unless he has actual or implied authority to make the admission, and that he may have authority to act, but not to talk. In answer to these contentions it is sufficient to say that following the decisions in *Crandall* v. *Boutell*, 95 Minn. 114, 103 N. W. 890, 5 Ann. Cas. 122; *Louisville & N. R. Co.* v. *Whitman*, 79 Ala. 328; *Phila. & Reading R. Co.* v. *Derby*, 14 How. (55 U. S.) 468, 14 L. Ed. 502, and other cases, we have already concluded that a master is responsible for the negligent conduct of his agents or servants within the scope of their duty in the furtherance of the master's business, although in excess of express instructions.

The declarations of the train agent and conductor made at the time of the taking of the ticket from Forrester and of his ejection from the train were properly admitted as part of the *res gestæ*. In *New Jersey Steamboat Co.* v. *Brockett*, 121 U. S. 649, 7 Sup. Ct. 1043, 30 L. Ed. 1052, the supreme court said: "The defendant objected, at the trial, to the competency of the statements of the mate. The objection was overruled and an exception taken. It is now insisted that the defendant is not responsible for the brutal language of its servants, and that the declarations of the mate to the plaintiff were not competent as evidence against the carrier. We are of the opinion that these declarations constitute a part of the *res gestæ*. They were made by one servant of the defendant while

assisting another servant in enforcing its regulation as to deck passengers. They were made when the watchman and the mate, according to the evidence of the plaintiff, were both in the very act of violently 'pushing' him, while in a helpless condition, to that part of the boat assigned to deck passengers. Plainly, therefore, they had some relation to the inquiry, whether the enforcement of that regulation was attended with unnecessary or cruel severity. They accompanied and explained the acts of the defendant's servants out of which directly arose the injuries inflicted upon the plaintiff. ( *Vicksburg & M. R. Co.* v. *O'Brien,* 119 U. S. 99, 105, 7 Sup. Ct. 118, 30 L. Ed. 299; *Ohio & Miss. R. Co.* v. *Porter,* 92 Ill. 437, 439; *Toledo & Wabash R. Co.* v. *Goddard,* 25 Ind. 190, 191. )" See, also, *White* v. *St. Ry. Co.,* 132 Mo. App. 339, 112 S. W. 279.

Exceptions were taken to the following instructions given at the request of the plaintiff:

"No. 5—The jury is instructed that the law requires a common carrier of passengers to exercise the highest practicable degree of care that human judgment and foresight are capable of, to make its passenger's journey safe. Whoever engages in the business of a common carrier impliedly promises that its passengers shall have this degree of care.

"No. 6—The jury is instructed that a common carrier's obligation is to carry its passengers safely and properly, and to treat them respectfully, and if it intrusts this duty to its servants the law holds it responsible for the manner in which they execute the trust. The law is well settled that the carrier is obliged to protect its passengers from violence and insult from whatever source arising. The carrier is not an insurer of its passenger's safety against every possible source of danger, but it is bound to use all such reasonable precautions as human judgment and foresight are capable of to make its passenger's journey safe and comfortable. The carrier must not only protect its passengers against violence and insults of strangers and copassengers, but also against the violence and insults of its own servants. If this duty

to the passenger is not performed, if this protection is not furnished, but, on the contrary, the passenger is assaulted, through the negligence or wilful misconduct of the carrier's servants, the carrier is necessarily responsible.

"No. 7—The jury is instructed that a passenger who has paid his fare to a common carrier, and has received a ticket properly issued and delivered to him evidencing such payment, is entitled to have the same honored by the carrier, and that a refusal to honor it by an agent, or the agents of the carrier, even though honestly mistaken concerning its validity, does not relieve the carrier from responsibility for such refusal to honor it.

"No. 8—The jury is instructed that if it believes from the evidence in this case that improper punch marks, or other mutilations, were made upon the railroad ticket submitted in evidence, were made by any agent of defendant of his own volition, and without the consent of the rightful owner thereof, such fact constitutes no defense to defendant for refusing to honor such ticket."

We find no error in these instructions as applied to the circumstances in this case. They appear to have been prepared from the opinion of the Supreme Court of Maine in the Goddard case, as approved by the Supreme Court of Montana and the decisions of other courts.

**15.** No. 5 follows closely the decision of this court in the Sherman case regarding injuries resulting from accident. We need not determine whether, in regard to the degree of care, it would be applicable in the case suggested in the brief of a passenger who might be injured by stumbling over a suit-case in the aisle. We do conclude that a high degree of care ought to be required before a passenger who is ill and without sufficient means to buy another ticket is expelled from the train hundreds of miles from his destination under the circumstances shown in this case.

Nos. 6, 7, and 8 are supported by different cases which we have heretofore considered, and No. 8 by what we hereafter state regarding defendant's refused instruction No. 11.

In *Taillon* v. *Mears*, 29 Mont. 161, 74 Pac. 421, 1 Ann. Cas. 613, it was held that a public carrier of passengers is bound to exercise the highest degree of care for their protection and safety, and is responsible for the negligent acts of his servants injuring a passenger, though such acts are not within the scope of the servant's employment. It is said in the opinion: "From the nature of the business, the actual transportation of passengers is usually intrusted to servants. These servants, therefore, must be charged with the exercise of the same care toward the passenger as is charged upon the master under the statutes and the contract of carriage; and it necessarily follows that any negligence or wrong committed to the passenger by the servant is a violation of such statute and contract, and if injury results therefrom the master is liable. The 'carrier is bound to do certain acts, and cannot excuse himself from liability upon the ground that he has committed their performance to others. The proper doing of the acts by another, appointed by him alone, is just as obligatory and binding upon him as though he undertook to perform them himself. He is bound to discharge his statutory and contractual obligations to the letter, and, if he commits the performance of these obligations to another, he does so at his own peril. There is no way in which he can shirk or evade their performance. If the servant in such cases does what the master could not do without violating the duties resting upon him, then the master must be held responsible for the acts of the servant, no matter how wrongful, wilful, or even malicious they may be. Therefore, whenever the misconduct of the servant causes a breach of the obligation or the violation of the duty of the master, the master is liable for such acts, if injury follow. (Wood on Master and Servant, sec. 321; *Dillingham* v. *Russell,* 73 Tex. 47, 11 S. W. 139, 3 L. R. A. 634, 15 Am. St. Rep. 753; *Weed* v. *Panama R. Co.,* 17 N. Y. 362, 72 Am. Dec. 474; *Stewart* v. *Brooklyn R. Co.,* 90 N. Y. 588, 43 Am. Rep. 185; *Milwaukee Railroad Co.* v. *Finney,* 10 Wis. 388.) This principle is further illustrated and emphasized by cases

where the servant of a carrier commits a wilful assault upon a passenger. If such act is a violation of the contract of carriage, *a fortiori* mere negligence on the part of the servant is such a violation. Yet the rule is well established that such an act is a violation of the contract of carriage, and renders the carrier liable. The courts will not allow the carrier to shield himself behind the objection that such act was beyond the scope of the servant's employment. One of the leading cases upon this proposition is that of *Goddard* v. *Grand Trunk R. Co.,* 57 Me. 202, 2 Am. Rep. 39, where the plaintiff, a passenger on the railroad of defendant, was insulted and assaulted by the brakeman on the train. The defendants contended that they were not liable because the brakeman's assault upon the plaintiff was wilful and malicious, and was not directly or impliedly authorized by them. Judge Walton says: 'The fallacy of this argument, when applied to the common carrier of passengers, consists in not discriminating between the obligation which he is under to his passenger and the duty which he owes a stranger. It may be true that, if the carrier's servant wilfully and maliciously assaults a stranger, the master will not be liable, but the law is otherwise when he assaults one of his master's passengers. The carrier's obligation is to carry his passenger safely and properly, and to treat him respectfully; and, if he intrusts the performance of this duty to his servants, the law holds him responsible for the manner in which they execute the trust. The law seems to be now well settled that the carrier is obliged to protect his passenger from violence and insult, from whatever source arising. He is not regarded as an insurer of his passenger's safety against every possible source of danger, but he is bound to use all such reasonable precautions as human judgment and foresight are capable of to make his passenger's journey safe and comfortable. He must not only protect his passenger against the violence and insults of strangers and copassengers, but *a fortiori*

against the violence and insults of his own servants. If this duty to the passenger is not performed, if this protection is not furnished, but, on the contrary, the passenger is assaulted and insulted through the negligence or wilful misconduct of the carrier's servant, the carrier is necessarily responsible. * * * The grounds of the carrier's liability may be briefly stated thus: The law requires the common carrier of passengers to exercise the highest degree of care that human judgment and foresight are capable of to make his passenger's journey safe. Whoever engages in the business impliedly promises that his passenger shall have this degree of care. In other words, the carrier is conclusively presumed to have promised to do what, under the circumstances, the law requires him to do. We say "conclusively presumed," for the law will not allow the carrier, by notice or special contract even, to deprive the passenger of this degree of care. If the passenger does not have such care, but, on the contrary, is unlawfully assaulted and insulted by one of the very persons to whom his conveyance is intrusted, the carrier's implied promise is broken, and his legal duty is left unperformed, and he is necessarily responsible to the passenger for the damages he thereby sustains. * * * As to them the contract of carriage imposes upon the carrier the duty, not only to carry safely and expeditiously between the termini of the route embraced in the contract, but also the duty to conserve by every reasonable means their convenience, comfort, and peace throughout the journey. And this same duty is, of course, upon the carrier's agents; they are under the duty of protecting each passenger from avoidable discomfort and from insult, from indignities, and from personal violence. And it is not material whence the disturbance of the passenger's peace and comfort and personal security or safety comes or is threatened. * * * It is wholly inapt and erroneous to apply the doctrine of scope of employment, as ordinarily understood, to such an act. Its only relation to the scope of

the servant's employment rests upon the disregard and violation of a duty imposed by the employment. This is, beyond question, we think, the true doctrine on principle; and while, as indicated above, there are adjudications against it, the great weight of authority supports it.' In addition to the above-cited authorities, further reference is hereby made to 4 Elliott on Railroads, sec. 1638; 3 Thompson on Negligence; *Richmond R. Co.* v. *Jefferson,* 89 Ga. 554, 16 S. E. 69, 17 L. R. A. 571, 32 Am. St. Rep. 87, and note 90 to 100; *Stranhan Bros. Catering Co.* v. *Coit,* 55 Ohio St. 398, 45 N. E. 634, 4 L. R. A. n.s. 506; *Stokes* v. *Saltonstall,* 13 Pet. 181, 10 L. Ed. 115; *New Jersey Steamboat Co.* v. *Brockett,* 121 U. S. 637, 7 Sup. Ct. 1039, 30 L. Ed. 1049; *Kellow* v. *Central Iowa R. Co.,* 68 Iowa 470, 23 N. W. 740, 27 N. W. 466, 56 Am. Rep. 858; *Thompson* v. *Yazoo R. Co.,* 47 La. Ann. 1107, 17 South. 503; *Perez* v. *New Orleans R. Co.,* 47 La. Ann. 1391, 17 South. 869; *Gallagher* v. *Bowie,* 66 Tex. 265, 17 S. W. 407; *Anderson* v. *Scholey,* 114 Ind. 553, 17 N. E. 125; *Farish* v. *Reigle,* 11 Grat. 697, 62 Am. Dec. 666; *Stockton* v. *Frey,* 4 Gill, 406, 45 Am. Dec. 138; *Sherley* v. *Billings,* 8 Bush, 147, 8 Am. Rep. 451; *Bayley* v. *Manchester R. Co.,* L. R. 7 C. P. 415; *Tuller* v. *Talbot,* 23 Ill. 357, 76 Am. Dec. 695; *Derwort* v. *Loomer,* 21 Conn. 245; *Roberts* v. *Johnson,* 58 N. Y. 613; *Frink* v. *Coe,* 4 G. Greene, 555, 61 Am. Dec. 141; *Gillingham* v. *Ohio River R. Co.,* 35 W.Va. 588, 14 S. E. 243, 14 L. R. A. 798, 29 Am. St. Rep. 827; *Chicago R. Co.* v. *Flexman,* 103 Ill. 546, 42 Am. Rep. 33; *Lakin* v. *Oregon Pac. R. Co.,* 15 Or. 220, 15 Pac. 641; *Penn. R. Co.* v. *Vandiver,* 42 Pa. 365, 82 Am. Dec. 520; *Dwinelle* v. *New York Cent. R. Co.,* 120 N. Y. 117, 24 N. E. 319, 8 L. R. A. 224, 17 Am. St. Rep. 611; *White* v. *Norfolk R. Co.,* 115 N. C. 631, 20 S. E. 191, 44 Am. St. Rep. 489; *Houston R. Co.* v. *Washington,* Tex. Civ. App. 1895, 30 S.W. 719; *Haver* v. *Central R. Co.,* 62 N. J. Law, 282, 41 Atl. 916, 43 L. R. A. 84, 72 Am. St. Rep. 647."

**16.** It is said that the prejudicial effect of instruction No. 7 is apparent when considered with the ruling of the

court that the defendant is liable for punitive damages. In this regard it should be observed that the instruction does not mention punitive damages, and that the court, quite favorably to the defendant, in its instruction No. 2, told the jury that if it believed from the evidence that Forrester was wrongfully ejected from the train, but that such ejection was accomplished in good faith by the defendant's agents, and without malice or unnecessary force, and without any wilful and wanton disregard for Forrester's rights, the company was not liable beyond the actual damage sustained by Forrester for the price of the ticket, the lost time resulting from the expulsion, and the actual expenses incurred by him in the employment of physicians and nurses and for hospital indebtedness.

17. If there were any statements in these instructions regarding the mutilation of the ticket which were not law, still their presentation to the jury would be error without prejudice. From the evidence it appears that the train agent claimed to take up the ticket because Forrester was not the purchaser, notwithstanding he complied with different requests to show that he was the purchaser, and the signatures he made for the train agent were sufficient to identify him as being the person that originally subscribed his name to the ticket as the purchaser. The ticket contains extra "L" punch marks from being doubled over and punched twice instead of once when its limitation was punched. The date of the sale, "Grand Central Depot Company, Houston, Texas, Sep. 22, 1907," is clearly stamped in four places on the back of the ticket, and its limitation, September 27, 1907, is clearly indicated by three punch marks over the figures "1907," the letters "Sep." and the figures "27." The other scattering "L" punch marks, not directly over dates, do not possibly indicate any earlier limitation after the sale of the ticket or that it had expired at the time it was taken up. If two dates of limitation had been punched on the ticket, one of which had expired at the time Forrester was expelled from the train, we can see how a train agent, while acting with due care and in

good faith, might have taken up the ticket if the punch marks showing that it had expired were not satisfactorily explained, so that the company would be relieved from punitive damages. But scattering or extra punch marks on the ticket, none of which show any date for its expiration after its sale which had expired at the time it was taken up, cannot be an excuse for the confiscation of the ticket and expulsion of the passenger, even if, as contended by the appellant, the law required only ordinary care to be exercised by the company.

18. Consequently, in this regard, if plaintiff's instruction No. 5, requiring extraordinary care, did not state the law applicable to this case, its giving was harmless error, for the defendant would not have been less liable for rejecting the ticket because it contained extra punch marks if the law and instruction required only ordinary care.

19. The ticket provides that if limited as to time it is not good for passage unless used to destination before midnight of the date canceled by the "L" punch in the margin. As there was no such date after the sale of the ticket punched, which had arrived at the time of Forrester's expulsion from the car, the company was not warranted under this provision in refusing to carry him. The ticket also provides: "6th. This ticket will be void if it shows any alterations or erasures, or if more than one date is canceled, and if more than one station is designated as the terminal point, it will be honored only to that station, indicated by punch marks nearest the starting point of that coupon."

Passengers are required to observe all the reasonable regulations made by a public carrier, but such carrier is not authorized to eject a passenger, and cannot relieve itself of liability for failure to keep its contract of carriage because one of its agents may accidentally place extra punch marks upon the ticket, as in this case, for which the passenger is in no way responsible. We have already referred to decisions sustaining this conclusion, and it is apparent that a railroad company, or any party

to any contract, cannot justify a breach of its agreement by the negligent or wilful act of its agent when the other party to the contract is without fault.

In *McGinnis* v. *Mo. Pac. R. Co.*, 21 Mo. App. 399, it was held that one who purchases a ticket of the railroad company's agent at its office has a right to rely upon the agent to give him a ticket expressive of the contract, including the time for carriage. This decision is in consonance with the one in *Calloway* v. *Mellett*, 15 Ind. App. 366, 44 N. E. 198, 57 Am. St. Rep. 238, and *Illinois Cent. R. Co.* v. *Gortskov*, to which we have heretofore referred, and with the opinion of the United States Circuit Court of Appeals, by Judge Hawley, in *N. P. R. Co.* v. *Pauson*, 70 Fed. 585, 17 C. C. A. 287, 30 L. R. A. 730. This and other cases are cited with approval in *Scofield* v. *Pennsylvania Co.*, 112 Fed. 855, 50 C. C. A. 553, 56 L. R. A. 224, and *Pennsylvania Co.* v. *Lenhart*, 120 Fed. 61, 56 C. C. A. 467.

**20.** Exception was taken to the refusal of the court to give defendant's instructions Nos. 3 and 11, which are somewhat similar. The following, No. 11, included substantially the objection involved in regard to No. 3, and may be considered as the antipode of plaintiff's instructions Nos. 7 and 8: "The jury are instructed that the face of the ticket is, as between the conductor or train agent and the passenger, conclusive evidence of the latter's right to transportation, and, where the ticket is defective or invalid, even through the fault of an agent of the carrier, the conductor or train agent cannot be expected to listen to the passenger's account of the transaction, but the passenger should either pay his fare or leave the train, and if the invalidity or defect of the ticket was due to the fault of some agent of the company, the passenger would be entitled to bring an action against the company for breach of contract, but, should he attempt to retain his place in the car without paying fare, and be expelled by the conductor or train agent, he can recover no damages for the expulsion. Hence, if the jury believe, in the

case at bar, that at the time Dick Forrester presented his ticket to the defendant's train agent, such ticket was defective by reason of having too many dates punched out, and the jury further believe that the defective condition of such ticket was due to a mistake or fault, on the part of some agent of the company, other than the agent to whom such ticket was presented for transportation, and the agent to whom such ticket was presented for transportation refused to honor the same because of its defect, then I instruct you that it was the duty of Dick Forrester to either pay his fare or leave the train, and that neither he nor the plaintiff in this action can recover any damage because the said Dick Forrester was ejected from defendant's train as a result of his refusal to pay his fare or leave the train of his own volition."

If it be conceded that ordinarily, as contended by the appellant, the conductor has a right to treat the ticket as conclusive, and that when there is any doubt the passenger should make a full explanation of how he came by the ticket, it is apparent from the evidence that Forrester, in addition to making signatures which were sufficient, duly endeavored to show that he was the original purchaser of the ticket, and as there were no punch marks or anything on the ticket showing that it had expired, these instructions were inapplicable to the facts in the case, even if the law were as appellant contends, for the ticket, not having expired, taken for its face value with the extra punch marks, did not warrant Forrester's expulsion from the train.

**21.** There was nothing in the circumstances which required him to pay a second time for his passage in order to have the right to be carried to his destination. A condition printed upon a ticket that, in case of controversy with the conductor and his refusal to accept it, the passenger agrees to pay the regular fare and apply for reimbursement at the office of the company, has been held to be unreasonable and void. (*O'Rourke* v. *Street Ry. Co.*, 103 Tenn. 124, 52 S. W. 872, 46 L. R. A. 614, 76 Am. St. Rep.

639; *Cherry* v. *R. Co.*, 191 Mo. 489, 90 S. W. 381, 2 L. R. A. n.s. 695, 109 Am. St. Rep. 830.)

The judgment and the order of the district court are affirmed.

NORCROSS, J.: I concur.

MCCARRAN, J., having become a member of the court after the argument and submission of the case, did not participate in the opinion.

### ON PETITION FOR REHEARING

By the Court, TALBOT, C. J.:

After examination of the extended petition for rehearing and the answer thereto, which cover the points previously presented by briefs and argument, we see no reason for changing the decision, which was reached only after mature deliberation.

It is urged that the importance of the questions involved justifies a rehearing before the full court; but, as the present members of the court who heard the argument and approved the opinion are satisfied with the conclusion reached, after a careful consideration of the petition for rehearing it seems to be unnecessary to further delay the case and put counsel to the trouble incident to a rehearing.

The writer of the opinion frankly confesses error in referring to Montello as being a place which is little more than a sidetrack. This was true when he passed there at different times years ago, but it seems the place is now considerably more than a sidetrack, and is a small town. This error is not regarded as being of such consequence as to justify a change in the judgment.

The petition for rehearing is denied.

NORCROSS, J.: I concur.